**UNITED STATES of America, Appellee,**

v.

**Kenneth LAUGHLIN and John Donnelly, Defendants,**

**Harris Goldman, Defendant–Appellant.**

**No. 200, Docket 93–1100.**

United States Court of Appeals, Second Circuit.

Argued Sept. 9, 1993.

Decided Dec. 1, 1993.

Bruce R. Bryan, Syracuse, NY, for defendant-appellant.

Craig A. Benedict, Asst. U.S. Atty., N.D.N.Y., Syracuse, NY (Gary L. Sharpe, U.S. Atty., of counsel), for appellee.

Before: NEWMAN, Chief Judge, PIERCE and MINER, Circuit Judges.

MINER, Circuit Judge:

Defendant-appellant Harris Goldman appeals from a judgment of conviction and sentence entered in the United States District Court for the Northern District of New York (Munson, *J.*), after a jury trial, convicting him of knowingly disposing of hazardous waste without a permit, in violation of the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901–6992k (West 1983 and Supp.1993) ("RCRA"). The judgment appealed from also convicted Goldman of failing to report the release of a hazardous substance as required by the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601–9675 (West 1983 & Supp.1993) ("CERCLA"), which requires that notification be given to the National Response Center or other appropriate governmental agency upon the release of a hazardous substance. The district court sentenced Goldman to concurrent prison terms of three-and-one-half years for the RCRA violation and three years for the CERCLA violation. He was further ordered to pay restitution to the United States in the amount of $607,868. Goldman primarily contends on appeal that the district court delivered an improper charge to the jury regarding the RCRA and CERCLA violations. For the reasons that follow, we affirm.

## BACKGROUND

In 1983, GCL Tie & Treating, Inc. ("GCL") purchased a railroad tie treating business located in Sidney, New York from the Railcon Corporation ("Railcon"). GCL was

owned by Goldman and his business partner, Thomas Cuevas.

The tie treatment process consisted of first placing untreated green ties into a large cylinder and then adding creosote. The creosote then was heated to boiling. As water and natural wood alcohols were drawn out by a vacuum process, the creosote penetrated the ties. The water, wood alcohols and some creosote, collectively referred to in the industry as "bolton water," would vaporize in the cylinder, where it was then drawn off and run through condensation coils. This mixture, consisting of twenty-five percent creosote, thereafter was placed in a heated evaporation tank. Once in this tank, the creosote quickly settled to the bottom due to its heavier weight, forming sludge. The water then was boiled off so that the remaining creosote sludge could be suctioned out and placed into storage for re-use in the treatment process.

Subsequent to 1983, GCL began having problems with its treatment process. As a result, excess creosote often became contaminated or spilled from the system. GCL supervisors regularly directed employees to dispose of the contaminated creosote by soaking it up with sawdust and dumping it in remote areas of the GCL property. GCL never had applied for a RCRA "TSD" (treatment, storage or disposal) permit and, therefore, neither the New York State Department of Environmental Conservation ("DEC") nor the United States Environmental Protection Agency ("EPA") was aware that GCL regularly handled, and disposed of, creosote.

On October 30, 1986, a large, accidental creosote spill occurred at GCL. Contrary to Goldman's instructions, this spill was reported to the DEC, which then began making periodic, pre-announced visits. With the exception of the October 30 spill, however, no regulatory agency had any knowledge or information of any other spill or disposal of creosote by GCL.

GCL began experiencing financial difficulties in 1987. Its problems were exacerbated when, early in June, GCL's boiler ceased to function properly. Without a properly functioning boiler, GCL could not recover the creosote sludge left over from the treatment process. GCL quickly began to run out of storage space for the bolton water, and GCL employees were directed to put the excess bolton water into a railroad tanker car that had recently delivered a shipment of new creosote. This tanker car remained on the GCL railroad spur and was used to store the bolton water generated by the treatment process.

During the time that the bolton water was being stored in the tanker car, Goldman became concerned over GCL's daily accrual of "demurrage" or rental charges for keeping the tanker car beyond its normal return date. After two weeks had passed with no resolution of the boiler problems, Goldman met with GCL Vice President of Operations and Plant Manager Ken Laughlin and a company consultant, Jack Thomas. The three discussed several methods of disposing of the bolton water, including: (1) returning the tanker car full of bolton water (approximately 22,000 gallons) to the creosote manufacturer, which would have proper disposal facilities available to it; (2) hiring a hazardous waste remover to cart away and properly dispose of the bolton water; and (3) pumping the bolton water into a truck and disposing of it by spraying it out of the back of the truck while it drove along dirt roads in Sidney. Goldman rejected the first two proposals as being too costly. He then proposed the spray truck scheme to Laughlin and Thomas, who both objected and informed Goldman that such a scheme would be illegal.

Shortly thereafter, Goldman began to demand repeatedly that Laughlin release the contents of the tanker car onto the ground. After Laughlin refused, Goldman informed him that he was going to release the creosote sludge himself. After one unsuccessful nocturnal attempt to release the creosote sludge, Goldman returned a second time, at approximately three o'clock in the morning, and successfully released the entire contents of the tanker car directly onto the ground.

The next morning, in the presence of GCL employees, Goldman admitted to Laughlin that he had dumped the creosote sludge, but told those present that they would be fired if

the release was reported to the Government. Goldman then instructed Laughlin to hire an outside contractor to cover the contaminated soil with rock and gravel. This was done, no report was made to either the DEC or the EPA, and the spill was never mentioned during subsequent inspections.

Financial conditions at GCL continued to deteriorate, and on August 6, 1987, Railcon exercised its rights under a note it held from the 1983 sale[1] and removed Goldman from operational control of GCL. Although Goldman remained an equity owner, he and the entire GCL board were removed as directors in August of 1987. GCL then filed for chapter 11 bankruptcy sometime in the autumn of 1987.

In December of 1987, Railcon President George Petti, informed by Laughlin of the June dumping, directed Laughlin to arrange for the contaminated soil to be excavated and removed. Approximately five hundred and twenty cubic yards of soil were recovered from the site where Goldman had released the creosote sludge.[2] This soil was added to the pile of soil that was excavated after the spill in October of 1986.

GCL continued its financial slide and, by May of 1988, the entire facility was abandoned. Nothing was done to dispose of or safeguard either the tens of thousands of gallons of creosote left behind or the fifty-five gallon drums of hydrochloric acid and other hazardous chemicals that were abandoned. By the summer of 1988, the DEC learned that the site had been deserted and began piecing together details of its true condition. A criminal investigation ensued and, after detailed inspections were conducted, the facility was declared a federal Superfund site. On January 17, 1991, Goldman was arrested, pursuant to a warrant, in the Eastern District of New York. On December 11, 1991, Goldman was indicted for illegal disposal of hazardous waste, in violation of RCRA, 42 U.S.C. § 6928(d)(2)(A), and failure to report the release of a hazardous substance, in violation of CERCLA, 42 U.S.C. §§ 9603(a) and (b).

During trial, Goldman testified on his own behalf and admitted that he knew GCL did not have a permit to dispose of hazardous waste; he knew that creosote sludge was a hazardous waste; he knew of the requirement to report the release of such material to the Government; he never reported any such release; and he knew that it was illegal to dump creosote sludge onto the ground. On September 4, 1992, a jury convicted Goldman on both counts. The district court sentenced Goldman to a prison term of forty-two months for the RCRA violation and a prison term of thirty-six months for the CERCLA violation, both terms to run concurrently. Goldman also was ordered to pay restitution to the United States in the amount of $607,868.

## DISCUSSION

Goldman argues that (1) the district court erred when instructing the jury regarding the elements of the RCRA and CERCLA violations; (2) there was insufficient evidence to support the jury's verdict; (3) the district court erred by not suppressing statements made by Goldman during a January 24, 1991 meeting with Assistant United States Attorney Craig Benedict; and (4) his sentence was inappropriate. We are unpersuaded by any of Goldman's arguments and, therefore, uphold his conviction.

### 1. RCRA

■ Goldman argues that the district court improperly instructed the jury regarding the elements of the RCRA violation. He claims that the Government was required to prove, as essential elements of the violation, that he was aware of the RCRA regulations applicable to creosote sludge and knew GCL had not obtained a permit to dispose of the creosote sludge and that the district court's

---

1. In order to finance the purchase in 1983, GCL gave Railcon a promissory note for part of the purchase price. In the event of default on the note, Railcon had the right to remove the GCL board of directors and elect a new board.

2. Although the contractor responsible for excavating the contaminated soil estimated that he moved approximately five hundred and twenty yards of soil, the EPA determined that approximately 1,400 cubic yards of soil were contaminated by the June 1987 spill.

failure to so instruct the jury was error. It is axiomatic that in a criminal prosecution the Government must satisfy its burden of proof beyond a reasonable doubt for every essential element of the crime with which the defendant is charged. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970); *United States v. Gjurashaj*, 706 F.2d 395, 398 (2d Cir.1983). Whether a district court has properly instructed a jury as to the elements of a crime is a question of law, which we review *de novo*. *See United States v. Carr*, 880 F.2d 1550, 1555 (2d Cir. 1989). Upon review, we conclude that the district court properly instructed the jury regarding the RCRA violation.

Goldman was convicted of violating 42 U.S.C. § 6928(d)(2)(A) which provides criminal penalties for:

> Any person who ...
>
> (2) knowingly treats, stores, or disposes of any hazardous waste identified or listed under this subchapter—
>
> (A) without a permit under this subchapter....

Appellant contends that the word "knowingly" applies not only to the prohibited act—treatment, storage, or disposal of a hazardous waste—but also to the fact that the hazardous waste has been identified or listed under RCRA and to the fact that a permit was lacking.

The district court instructed the jury that it had to find that the Government had proved the following elements beyond a reasonable doubt:

(1) "the defendant knowingly disposed of or caused others to dispose of creosote sludge on or about the date set forth in the indictment;"

(2) "that pursuant to [RCRA], the creosote sludge was hazardous;"

(3) "the defendant knew creosote sludge had a potential to be harmful to others or the environment or, in other words, it was not a harmless substance like uncontaminated water;" and

(4) "neither defendant nor GCL had obtained a permit or interim status which authorized the disposal of hazardous waste under [RCRA]."

Prior to delivering these instructions, the district court told the jury that creosote sludge was a hazardous waste as defined under RCRA. Appellant makes no objection to this aspect of the jury charge.

■ When knowledge is an element of a statute intended to regulate hazardous or dangerous substances, the Supreme Court has determined that the knowledge element is satisfied upon a showing that a defendant was aware that he was performing the proscribed acts; knowledge of regulatory requirements is not necessary. *See United States v. International Minerals & Chem. Corp.*, 402 U.S. 558, 563–65, 91 S.Ct. 1697, 1700–1701, 29 L.Ed.2d 178 (1971) (in prosecution for knowingly violating a hazardous materials regulation, Government was not required to prove that the defendant was aware of regulation, but only that he was aware of shipment of the hazardous materials); *see also United States v. Balint*, 258 U.S. 250, 254, 42 S.Ct. 301, 303, 66 L.Ed. 604 (1922) (manifest purpose of statute proscribing sale of narcotics to persons not having written order "is to require every person dealing in drugs to ascertain at his peril whether that which he sells comes within the inhibition of the statute"). "[W]here, as here ... dangerous or deleterious devices or products or obnoxious waste materials are involved, the probability of regulation is so great that anyone who is aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation." *International Minerals*, 402 U.S. at 565, 91 S.Ct. at 1701–1702. In light of this precedent, particularly the presumption of awareness of regulation set forth in *International Minerals*, it is clear that section 6928(d)(2)(A) requires only that a defendant have a general awareness that he is performing acts proscribed by the statute. The district court did not err in declining to charge that the statute required knowledge that the creosote sludge was "identified or listed" under RCRA.

■ Although this Court never before has been presented with the question of whether 42 U.S.C. § 6928(d)(2)(A) requires that a defendant have knowledge of the lack of a

permit for hazardous waste disposal, most of the courts of appeals that have addressed this issue have responded in the negative. *See, e.g., United States v. Dean,* 969 F.2d 187, 191 (6th Cir.1992) ("[6928(d)(2)(A) ] does not require that the person charged have known that a permit was required, and that knowledge is not relevant."), *cert. denied,* —— U.S. ——, 113 S.Ct. 1852, 123 L.Ed.2d 475 (1993); *United States v. Hoflin,* 880 F.2d 1033, 1037 (9th Cir.1989) (expressly holding that knowledge of lack of permit is not an element of section 6928(d)(2)(A) offense), *cert. denied,* 493 U.S. 1083, 110 S.Ct. 1143, 107 L.Ed.2d 1047 (1990); *see also United States v. Goldsmith,* 978 F.2d 643, 645–46 (11th Cir.1992) (per curiam) (approving jury instruction which did not require knowledge of the absence of a permit); *United States v. Dee,* 912 F.2d 741, 745 (4th Cir.1990) (Government need not prove that defendants knew that violation of RCRA was a crime nor did they need to know of existence of specific regulations or requirements), *cert. denied,* 499 U.S. 919, 111 S.Ct. 1307, 113 L.Ed.2d 242 (1991). *But see United States v. Johnson & Towers, Inc.,* 741 F.2d 662, 667–68 (3d Cir. 1984) (stating in dicta that knowledge of the absence of a permit is required for conviction under section 6928(d)(2)(A)), *cert. denied,* 469 U.S. 1208, 105 S.Ct. 1171, 84 L.Ed.2d 321 (1985). Referring to the knowledge requirement, the panel in *Hoflin* stated, "[t]he statute is not ambiguous. On the contrary, '[t]he language is plain and the meaning is clear.'" *Hoflin,* 880 F.2d at 1037 (quoting *United States v. Patterson,* 820 F.2d 1524, 1526 (9th Cir.1987)). It is also our perception that a defendant's knowledge that a permit is lacking is not an element of the offense defined by 42 U.S.C. § 6928(d)(2)(A). This conclusion is supported not only by the reasoning of *International Minerals* but also by the fact that the word "knowing" is included in paragraphs (B) and (C) of section 6928(d)(2) but notably omitted from paragraph (A), with which we are concerned. With respect to the mens rea required by section 6928(d)(2)(A), the Government need prove only that a defendant was aware of his act of disposing of a substance he knew was hazardous. Proof that a defendant was aware of the lack of a permit is not required. Accordingly, we hold that the district court properly instructed the jury concerning Goldman's violation of section 6928(d)(2)(A).

### 2. *CERCLA*

■ Goldman also challenges the district court's failure to instruct the jury that the Government must prove, as an element of the CERCLA offense, that Goldman knew that his release of creosote sludge violated CERCLA. The reasoning set forth above regarding the RCRA violation applies with equal force to the CERCLA count. Goldman was charged with violating 42 U.S.C. § 9603(a), which provides, in pertinent part:

> Any person in charge of a ... facility shall, as soon as he has knowledge of any release (other than a federally permitted release) of a hazardous substance from such ... facility in quantities equal to or greater than those determined pursuant to section 9602 of this title, immediately notify the National Response Center ... of such release.

42 U.S.C. § 9603(a).

The district court instructed the jury that it must find the Government had proven the following elements beyond a reasonable doubt:

(1) "that there was a hazardous substance;"

(2) "that it was in an amount of equal to or greater than the reportable quantity;"

(3) "that it was released from a facility;"

(4) "that this release was other than a federally permitted release;"

(5) "that [the] defendant was a person in charge of the facility;" and

(6) "that the defendant failed to give immediate notice to the National Response Center as soon as he had knowledge of that release."

Like RCRA, CERCLA is a regulatory scheme intended to protect the public health and safety. The reporting requirement at issue here insures the Government's ability to "move quickly to check the spread of a hazardous release." *United States v. Carr,* 880 F.2d 1550, 1552 (2d Cir.1989). In accordance with our interpretation of "knowingly"

in RCRA, discussed *supra,* we find that section 9603(a) does not demand knowledge of the regulatory requirements of CERCLA; it demands only that defendant be aware of his acts. *See United States v. Buckley,* 934 F.2d 84, 88 (6th Cir.1991) (knowledge, as used in CERCLA, means only that the defendant is aware of his acts, rather than knowledge of the specific statute or legal requirements); *see also International Minerals,* 402 U.S. at 564–65, 91 S.Ct. at 1701 (defendant who is aware that his acts are harmful may be found guilty even though unaware of regulatory scheme). Accordingly, we conclude that the district court properly instructed the jury regarding the CERCLA violation.

3. *Omission of the Word "Substantial"*

■ Goldman additionally claims the jury should have been instructed that, to establish the necessary elements of the RCRA violation, it was constrained to find that he knew creosote sludge posed a *substantial* present or potential hazard. Although Goldman failed to make an appropriate request for this instruction, we may review jury instructions for plain error. "The failure to instruct [the jury] on an essential element of the offense generally constitutes plain error, permitting appellate review even if the defendant has failed to object to the instruction at trial." *United States v. Javino,* 960 F.2d 1137, 1141 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 477, 121 L.Ed.2d 383 (1992). "If there was such a failure to instruct, but there was sufficient evidence in the record to permit the jury to find the element proven beyond a reasonable doubt, the appropriate remedy is vacation of the conviction and remand for a new trial." *Id.; see United States v. Londono–Villa,* 930 F.2d 994, 1001 (2d Cir.1991). We do not think that an "essential element" was omitted from the instruction given.

RCRA defines "hazardous waste" as any "solid waste ... which ... may ... pose a *substantial* present or potential hazard to human health or the environment when improperly ... disposed of." 42 U.S.C. § 6903(5)(B) (emphasis supplied). While inclusion of the word "substantial" would have resulted in a more complete and accurate

instruction by the district court, we do not find its omission to be plain error. *Cf. United States v. Baytank, Inc.,* 934 F.2d 599, 611 (5th Cir.1991) (omission of the word "substantial" was not plain error where instruction required defendant to know that material "had the potential to be harmful"). Indeed, other courts have upheld jury instructions identical or substantially similar to those involved here. *See Goldsmith,* 978 F.2d at 645 (defendant must know that material "had the potential to be harmful"); *Hoflin,* 880 F.2d at 1039 (instruction identical to that delivered in *Goldsmith* was "sufficient"). We conclude that no plain error was committed by the district court since its instructions, taken as a whole, "logically ... require that the jury find that the waste was actually hazardous in the sense that § 6903(5)(B) ... defines it." *Baytank,* 934 F.2d at 611.

We believe, however, that the better course is to include the word "substantial" in jury instructions relating to hazardous waste under RCRA. Section 6903(5) clearly provides that before waste will be deemed "hazardous" within the meaning of RCRA, it must present not simply a potential hazard, but a *substantial* potential hazard. The jury should have the benefit of the statutory definition.

We have examined the other arguments advanced by Goldman and find them to be without merit.

CONCLUSION

The judgment of conviction is affirmed.