UNITED STATES of America, Appellee,

v.

Robert H. HOPKINS, Defendant–
Appellant.

No. 989, Docket 94–1428.

United States Court of Appeals,
Second Circuit.

Argued Feb. 9, 1995.

Decided April 28, 1995.

Joseph C. Hutchison, Asst. U.S. Atty., New Haven, CN (Christopher F. Droney, U.S. Atty., D. Conn., on the brief), for appellee.

Robert B. Mann, Providence, RI (Mann & Mitchell, on the brief), for defendant-appellant.

Before: OAKES, KEARSE, and CABRANES, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Robert H. Hopkins appeals from a judgment entered in the United States District Court for the District of Connecticut following a jury trial before Ellen Bree Burns, *Judge*, convicting him on one count of falsifying, tampering with, or rendering inaccurate a monitoring device or method required to be maintained pursuant to the Clean Water Act ("CWA" or the "Act"), 33 U.S.C. §§ 1251–1387 (1988 & Supp. V 1993), in violation of *id.* § 1319(c)(4); one count of violating the restrictions of a discharge permit issued pursuant to the Act, in violation of *id.* § 1319(c)(2)(A); and one count of conspiracy to violate §§ 1319(c)(2)(A) and (c)(4), in violation of 18 U.S.C. § 371 (1988). Hopkins was sentenced principally to 21 months' imprisonment, to be followed by a two-year period of supervised release, and ordered to pay a $7,500 fine. On appeal, he contends that the district court improperly instructed the jury on the knowledge element of the offenses with which he was charged and erred in giving a "conscious avoidance" instruction with respect to the two substantive counts. For the reasons below, we affirm the judgment of conviction.

## I. BACKGROUND

The present prosecution focused on environmental problems of Spirol International Corporation ("Spirol"), a manufacturer of metal shims and fasteners in northeastern Connecticut. Spirol's manufacturing operation involved a zinc-based plating process that generated substantial amounts of wastewater containing zinc and other toxic materials; this wastewater was discharged into the nearby Five Mile River. The State of Connecticut's Department of Environmental Protection ("DEP"), pursuant to authority delegated by the United States Environmental

Protection Agency, administered the CWA provisions applicable to Spirol's discharges into the river. In 1987, Spirol, then operating under the name "CEM Co.," entered into a consent order with DEP, requiring Spirol to pay a $30,000 fine for past zinc-related discharge violations and to comply in the future with discharge limitations specified in the order. In February 1989, DEP issued a modified "wastewater discharge permit" (the "DEP permit") imposing more restrictive limits on the quantity of zinc and other substances that Spirol was permitted to release into the river.

From at least 1987 through September 6, 1990, Hopkins was Spirol's vice president for manufacturing. Hopkins signed the 1987 consent order with DEP on behalf of Spirol, and he had corporate responsibility for ensuring compliance with the order and the DEP permit. The present prosecution charged that between March 1989 and September 1990 Hopkins deliberately tampered with Spirol's wastewater testing and falsified its reports to DEP. The government's proof at trial included the testimony of Dennis Mark Morrison, Aaron Anderson, and John J. Morris, who at the pertinent times were Spirol employees. Taken in the light most favorable to the government, the evidence was as follows.

A. *The Evidence as to the Sampling Process Directed by Hopkins*

The DEP permit required Spirol each week to collect a sample of its wastewater and send it to an independent laboratory by Friday morning of that week. Spirol was required to report the laboratory results to DEP in a discharge monitoring report once a month. Under the DEP permit, the concentrations of zinc in Spirol's wastewater were not to exceed 2.0 milligrams per liter in any weekly sample, nor to average more than one milligram per liter in any month.

During the period March 1989 to September 1990, Spirol began its weekly sampling process on Mondays. A composite sample of the plant's wastewater was aggregated over a 24-hour period by Morrison and Anderson, who were involved in the zinc-plating process. Morrison was Anderson's supervisor

and reported directly to Hopkins. Before sending a sample to the independent laboratory, Morrison and Anderson measured the concentration of zinc in the sample, and Morrison reported the results to Hopkins. Morrison and Anderson testified that if the sample collected on a Tuesday contained less than one milligram of zinc per liter, it would be sent promptly to the independent laboratory with a "chain of custody" record signed by Hopkins. If the Tuesday sample was not below that level, however, it was not sent to the laboratory. Morris, Spirol's maintenance engineer, testified that Hopkins expressed concern that if the samples did "not meet the permit requirements ... the company would be facing another fine." (Trial Transcript ("Tr.") at 48.) Accordingly, whenever the Tuesday in-house test indicated a zinc content above the one-milligram-per-liter level, Hopkins directed that that sample be discarded and that another 24-hour composite sample be taken on Wednesday. In 54 of the 78 weeks in question, Spirol's samples were sent to the laboratory later than Tuesday.

If a Wednesday sample failed the in-house test, Hopkins sometimes ordered that it too be discarded and that another sample be taken on Thursday; but he more often instructed Morrison and Anderson to dilute the Wednesday sample with tap water or to reduce the zinc concentration using an ordinary coffee filter. Similarly, if the Thursday sample failed to meet the proper standard, Hopkins usually directed that it be diluted or filtered; but, Morrison testified, "A lot of times, we would go right through Friday." (Tr. at 90.) Any Friday sample that failed to meet the standard was always diluted or filtered, in order that a good sample could be sent to the laboratory by the Friday deadline. Morrison testified that in some of the samples submitted to the laboratory, there was more tap water than wastewater.

From March 1989 to September 6, 1990, Hopkins filed with DEP monthly discharge monitoring reports consolidating the weekly test results from the independent laboratory. These reports showed no zinc concentrations above one milligram per liter. On each report, Hopkins signed the following certification:

I certify under penalty of law that this document and all attachments were prepared under by [sic] direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information. [sic] The information is, to the best of my knowledge and belief, true, accurate and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

Contrary to Hopkins's certifications of his belief as to truth and accuracy, Morrison testified that Hopkins had caused the samples to be "tampered with" about "40 percent of the time." (Tr. at 115.) Morrison testified that on 25–30 occasions when he reported back to Hopkins that he had finally succeeded in getting a satisfactory sample by means of dilution or filtration, Hopkins responded, "I know nothing, I hear nothing." (Tr. at 116.) Anderson testified that on one occasion in the summer of 1989, he reported directly to Hopkins that an unsatisfactory sample had been collected. Hopkins's response was, " 'See what you could do with it' " (Tr. at 136); when Anderson returned three hours later and reported that the sample was now satisfactory, Hopkins signed the chain-of-custody record without comment, question, or sign of surprise.

Morris testified that he told Hopkins that the testing procedures being used were improper. Regardless of the test results, Spirol continued to discharge its wastewater into the river.

### B. *The Trial Court's Instructions as to Knowledge*

In December 1993, Hopkins was charged in a three-count indictment alleging (1) that he had knowingly falsified or tampered with Spirol's discharge sampling methods, in violation of 33 U.S.C. § 1319(c)(4) (count one); (2) that he had knowingly violated the conditions of the DEP permit, in violation of 33 U.S.C. § 1319(c)(2)(A) (count two); and (3)

that he had conspired to commit those offenses, in violation of 18 U.S.C. § 371.

At trial, the district court instructed the jury as follows, over Hopkins's objections, on the knowledge element of each count. As to count one, the court stated:

> Knowledge may be established by direct or circumstantial evidence. One may not willfully or intentionally remain ignorant of a fact, material or important to his conduct to escape the consequences of criminal law.
>
> If you find beyond a reasonable doubt that the defendant was aware that there was a high probability that employees of Spirol were tampering with a monitoring device or method but he deliberately and consciously avoided confirming this fact so that he could deny knowledge if apprehended, then you may treat this deliberate avoidance of [sic] the equivalent of knowledge, unless you find the defendant actually believed that Spirol employees were not tampering with a monitoring device or method.
>
> A showing of negligence, mistake or even foolishness on the part of the defendant is not enough to support an inference of knowledge.
>
> It is not necessary for the government to prove that the defendant intended to violate the law or that the defendant had any specific knowledge of the particular statutory, regulatory or permit requirements imposed under the Clean Water Act.
>
> The government must prove, beyond a reasonable doubt, however, that the defendant acted voluntarily or intentionally to falsify, tamper with or render inaccurate a monitoring device or method and that he did not do so by mistake, accident or other innocent reason.

(Tr. at 285–86.) The court delivered substantially the same instruction with respect to count two:

> To reiterate, the government need not prove that the defendant intended to violate the law or that the defendant had any specific knowledge of the specific requirements of the conditions and limitations of the permit.

The government must prove, beyond a reasonable doubt, however, that in taking actions or causing actions to be taken, in violation of the permit, he acted voluntarily or intentionally and not by mistake, accident, ignorance of the facts, or for other innocent reason.

The element of acting knowingly may also be satisfied if you find beyond a reasonable doubt ... that the defendant willfully or intentionally remained ignorant of relevant material facts.

(Tr. at 288.)

With respect to the knowledge element of the conspiracy charged in count three, the court instructed that

[w]hile the government must prove that the defendant entered the conspiracy knowingly and willfully, understanding the purpose of the agreement, it need not establish that the defendant acted with a specific intent to violate or disregard the law.

Thus, if you are convinced beyond a reasonable doubt that the defendant entered the conspiracy with an understanding that the purpose of the conspiracy was to falsify or tamper with a monitoring device or method, and/or to violate the state discharge permit, it is immaterial whether the defendant knew such acts are unlawful.

(Tr. at 293–94.)

The jury convicted Hopkins on all three counts. He was sentenced as indicated above, and this appeal followed.

## II. DISCUSSION

On appeal, Hopkins contends principally that the district court instructed the jury erroneously as to the knowledge element of each count of the indictment. He also contends that, as to the substantive counts, the court should not have given a conscious-avoidance instruction. We reject all of his contentions.

### A. *The Knowledge Requirements Under the CWA*

#### 1. *Section 1319(c)(2)(A)*

▪ Subsection (2) of § 1319(c), whose violation was alleged in count two of the indictment, establishes criminal penalties, including fines of up to $50,000 per day and imprisonment for up to three years, for "[a]ny person" who, *inter alia,*

> *knowingly violates* section 1311, 1312, 1316, 1317, 1318, 1321(b)(3), 1328, or 1345 of [Title 33], or any permit condition or limitation implementing any of such sections in a permit issued under [the CWA] by the Administrator or by a State.

33 U.S.C. § 1319(c)(2)(A) (emphasis added). Hopkins contends that the district court should have instructed the jury that it could not find him guilty of violating this section unless it found that he knew he was acting in violation of the CWA or the DEP permit. We disagree.

Section 1319(c)(2)(A) itself does not expressly state whether the adverb "knowingly" is intended to require proof that the defendant had actual knowledge that his conduct violated any of the statutory provisions that follow the phrase "knowingly violates" or had actual knowledge that his conduct violated a permit condition. As a matter of abstract logic, it would seem that a statute making it unlawful to "knowingly violate[ ]" a given statutory or permit provision would require proof that the defendant both violated and knew that he violated that provision. In defining the mental state required for conviction under a given statute, however, the courts must seek the proper "'inference of the intent of Congress,'" *Staples v. United States,* —— U.S. ——, ——, 114 S.Ct. 1793, 1797, 128 L.Ed.2d 608 (1994) ("*Staples*") (quoting *United States v. Balint,* 258 U.S. 250, 253, 42 S.Ct. 301, 302, 66 L.Ed. 604 (1922)), and in construing knowledge elements that appear in so-called "public welfare" statutes—*i.e.,* statutes that regulate the use of dangerous or injurious goods or materials—the Supreme Court has inferred that Congress did not intend to require proof that the defendant knew his actions were unlawful. *See, e.g., United States v. International Minerals & Chemical Corp.,* 402 U.S. 558, 565, 91 S.Ct. 1697, 1701, 29 L.Ed.2d 178 (1971) (discussed below); *United States v. Freed,* 401 U.S. 601, 607–08, 91 S.Ct. 1112, 1117, 28 L.Ed.2d 356 (1971) (conviction under

26 U.S.C. § 5861(d) for possession of unregistered hand grenades did not require knowledge of registration requirement); *United States v. Dotterweich*, 320 U.S. 277, 280–81, 64 S.Ct. 134, 136, 88 L.Ed. 48 (1943) (strict liability under 21 U.S.C. § 331 for distribution of adulterated drugs); *United States v. Balint*, 258 U.S. at 252–54, 42 S.Ct. at 302–03 (strict liability under § 2 of Narcotic Act of December 17, 1914, for sale of narcotics).

In *United States v. International Minerals & Chemical Corp.* ("*International Minerals*"), the Court construed a statute that authorized the Interstate Commerce Commission ("ICC") to promulgate regulations governing the transport of corrosive liquids and imposed criminal penalties on those who "knowingly violate[d] any such regulation," *see* 18 U.S.C. § 834(f) (1970) (repealed 1979). The Court held that the quoted phrase required the government to prove only that the defendant knew the nature of his acts, not that he knew his acts violated an ICC regulation. *See* 402 U.S. at 565, 91 S.Ct. at 1701. The Court stated that "where ... dangerous or deleterious devices or products or obnoxious waste materials are involved, the probability of regulation is so great that anyone who is aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation." *Id.* Applying this presumption of awareness, the Court concluded that the phrase "knowingly violate[d] any [ICC] regulation" was meant to be a "shorthand" method of referring to the acts or omissions contemplated by the statute. *Id.* at 560–62, 91 S.Ct. at 1699–1700. Noting "the general rule that ignorance of the law is no excuse," *id.* at 563, 91 S.Ct. at 1700, the Court "decline[d] to attribute to Congress the inaccurate view that" use of the word "knowingly" would "require[ ] proof of knowledge of the law, as well as the facts," *id. See also Staples*, —— U.S. at —— – —— n. 3, 114 S.Ct. at 1805–06 n. 3 (Ginsburg, J., concurring) ("The *mens rea* presumption requires knowledge only of the facts that make the defendant's conduct illegal, lest it conflict with the related presumption, 'deeply rooted in the American legal system,' that, ordinarily, 'ignorance of the law or a mistake of law is no defense to criminal prosecution.'") (quoting *Cheek v. United States*, 498 U.S.

192, 199, 111 S.Ct. 604, 609, 112 L.Ed.2d 617 (1990)).

This Court in *United States v. Laughlin*, 10 F.3d 961, 964–67 (2d Cir.1993) ("*Laughlin*"), *cert. denied*, —— U.S. ——, 114 S.Ct. 1649, 128 L.Ed.2d 368 (1994), applied the *International Minerals* "presumption of awareness of regulation" in construing provisions of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901–6992k (1988 & Supp. V 1993), and the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601–9675 (1988 & Supp. V 1993). RCRA provides for the imposition of criminal penalties against any person who "knowingly treats, stores, or disposes of any hazardous waste identified or listed under [RCRA]" without a permit, 42 U.S.C. § 6928(d)(2). We held that this provision did not require the government to prove that the defendant knew that the waste he dealt with was identified or listed under RCRA or that he lacked a disposal permit. Rather, we held that the government need prove only that the defendant knew the nature of the hazardous waste matter with which he dealt. *See Laughlin*, 10 F.3d at 966. *Accord United States v. Wagner*, 29 F.3d 264, 265–66 (7th Cir.1994); *United States v. Dean*, 969 F.2d 187, 191 (6th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1852, 123 L.Ed.2d 475 (1993); *United States v. Dee*, 912 F.2d 741, 745 (4th Cir. 1990), *cert. denied*, 499 U.S. 919, 111 S.Ct. 1307, 113 L.Ed.2d 242 (1991); *United States v. Hoflin*, 880 F.2d 1033, 1037–38 (9th Cir. 1989), *cert. denied*, 493 U.S. 1083, 110 S.Ct. 1143, 107 L.Ed.2d 1047 (1990). Similarly, with respect to CERCLA, which requires agency notification of an excess discharge of a hazardous substance by any person in charge of a facility "as soon as he has knowledge of any release (other than a federally permitted release)," 42 U.S.C. § 9603(a), we held that the government was not required to prove that the defendant was aware of the regulatory requirements but only that he was "aware of his acts." *Laughlin*, 10 F.3d at 967.

For several reasons, we view the presumption of awareness of regulation, applied to the ground-pollution offenses in *Laughlin*, to

be equally applicable to the phrase "knowingly violates [the specified sections or permit]" in § 1319(c)(2)(A). Congress considered discharges of hazardous waste onto the ground, which are regulated in RCRA, as no less serious than such discharges into water, *see, e.g.,* S.Rep. 99–50, 99th Cong., 1st Sess. 29 (1985) (discussing increase in criminal penalties proposed by 1987 amendments to CWA to parallel existing penalties under "RCRA [to] reflect the commensurately serious nature of the violations to be criminally prosecuted under the Clean Water Act"). Further, the CWA sections to which § 1319(c)(2)(A) refers regulate a broad range of pollutant discharges, including "[w]ater quality related effluent[s]," *see* 33 U.S.C. § 1312; "toxic pollutants" listed in accordance with § 1317(a), *see* 33 U.S.C. § 1317; "[o]il and hazardous substance[s]," *see* 33 U.S.C. § 1321; and "sewage sludge," *see* 33 U.S.C. § 1345. The vast majority of these substances are of the type that would alert any ordinary user to the likelihood of stringent regulation. Moreover, the very fact that a governmental permit has been issued enhances the user's awareness of the existence of regulation.

The legislative history of § 1319(c)(2)(A) also lends support to the conclusion that, under that section, the government need not prove that the defendant knew his conduct was unlawful. Prior to 1987, the substance of § 1319(c)(2)(A) appeared in § 1319(c)(1), which provided penalties for one who *"willfully* or negligently" violated that section. *See* 33 U.S.C. § 1319(c)(1) (1982) (emphasis added). In 1987, Congress amended § 1319(c)(1), placing the prohibitions against intentional and negligent violations in separate sections, addressing negligent violations in § 1319(c)(1)(A) and intentional violations in § 1319(c)(2)(A); and in § 1319(c)(2)(A), it changed the term "willfully" to "knowingly." Though the congressional reports on the bills leading to the 1987 amendments do not expressly discuss the change from "willfully" to "knowingly," they make clear that one goal of the amendments was to strengthen the criminal sanctions. *See, e.g.,* S.Rep. No. 50, 99th Cong., 1st Sess. 30 (1985) (noting "[s]trong public support" for "[t]he addition and stren[g]thening of criminal sanctions in

the Act for knowing violations"); H.R.Conf. Rep. No. 1004, 99th Cong., 2d Sess. 138 (1986) (amendments intended to establish "increased penalties for … criminal violations of the [CWA]"). One way of heightening criminal sanctions is to reduce the *mens rea* element of the prohibited acts, and a change from prohibiting "willful" acts to prohibiting "knowing" acts may be viewed as such a reduction. The term "willfulness" has generally, albeit not uniformly, been interpreted as referring to knowledge that the conduct in question was wrongful or unlawful. *See, e.g., Ratzlaf v. United States,* —— U.S. ——, ——, 114 S.Ct. 655, 657, 126 L.Ed.2d 615 (1994) (to convict of "willfully" structuring transactions in violation of 31 U.S.C. § 5322, government must prove that the defendant had knowledge that structuring itself was unlawful); *Cheek v. United States,* 498 U.S. 192, 201, 111 S.Ct. 604, 610, 112 L.Ed.2d 617 (1991) (willfulness in 26 U.S.C. § 7201, prohibiting federal tax evasion, means the "voluntary, intentional violation of a known legal duty") (internal quotes omitted); *United States v. Pomponio,* 429 U.S. 10, 12, 97 S.Ct. 22, 23, 50 L.Ed.2d 12 (1976) (per curiam) (same re 26 U.S.C. § 7206(1), prohibiting willful filing of false federal income tax returns); *United States v. Bishop,* 412 U.S. 346, 361, 93 S.Ct. 2008, 2017, 36 L.Ed.2d 941 (1973) (same); *United States v. Murdock,* 290 U.S. 389, 396, 54 S.Ct. 223, 226, 78 L.Ed. 381 (1933) (same re 26 U.S.C. § 1265(a), prohibiting willful failure to pay federal tax); *United States v. Gurary,* 860 F.2d 521, 523 (2d Cir.1988) (same re prosecution under 26 U.S.C. § 7206(2) for willfully aiding and assisting the filing of false federal tax returns), *cert. denied,* 490 U.S. 1035, 109 S.Ct. 1931, 104 L.Ed.2d 403 (1989). *But see United States v. Collins,* 957 F.2d 72, 75–77 (2d Cir.) (inferring, in light of legislative history, that Congress intended "willfully" in 18 U.S.C. § 922(a)(1)(D) (unlicensed dealing in firearms) to mean merely knowingly and purposefully doing an act that the law forbids), *cert. denied,* 504 U.S. 944, 112 S.Ct. 2285, 119 L.Ed.2d 210 (1992); *United States v. Peltz,* 433 F.2d 48, 54–55 (2d Cir.1970) (under 15 U.S.C. § 78ff(a), a defendant may be convicted of willfully violating a securities regulation

of whose existence he is unaware), *cert. denied,* 401 U.S. 955, 91 S.Ct. 974, 28 L.Ed.2d 238 (1971).

The prevalent interpretation of "willfully" to mean intentionally violating a law of whose existence the defendant was aware was reflected in *United States v. Murdock,* for example, in which the Supreme Court held that a defendant prosecuted under an Internal Revenue Code provision prohibiting a "willful[ ]" failure to pay a tax may defend by showing his bona fide misunderstanding of the requirements of that section. *See* 290 U.S. at 396, 54 S.Ct. at 226. The *International Minerals* Court, in ruling that "knowingly violates [ICC] regulations" did not require knowledge of the pertinent regulations, pointed out that if Congress had wished to require proof that the defendant knew his acts were unlawful, it could have used the word "willfully" as it had done in the provision construed in *Murdock. See' International Minerals,* 402 U.S. at 564, 91 S.Ct. at 1701. We think this observation is especially pertinent where Congress has amended a statutory provision, as it did with respect to § 1319(c)(2)(A), to change the *mens rea* element from "willfully" to "knowingly." We infer from this reduction that, by the latter term, Congress intended not to require proof that the defendant knew his conduct violated the law or a regulatory permit.

Thus, we conclude that the purpose and legislative history of § 1319(c)(2)(A)·indicate that Congress meant that that section would be violated if the defendant's acts were proscribed, even if the defendant was not aware of the proscription.

The only other Circuit, of which we are aware, to construe the knowledge requirement of § 1319(c)(2)(A) has reached the same conclusion. In *United States v. Weitzenhoff,* 35 F.3d 1275 (9th Cir.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 939, 130 L.Ed.2d 884 (1995), the Ninth Circuit noted that the criminal provisions of the CWA define a set of "public welfare" offenses that are "clearly designed to protect the public at large from the potentially dire consequences· of water pollution." *Id.* at 1286 (citing S.Rep. No. 99–50, 99th Cong., 1st Sess. 29 (1985)). The *Weitzenhoff* court upheld the trial court's instruction that, with respect to knowledge, the government was required to prove only that a defendant knew he was discharging the pollutants in question and was "not required to prove that the defendant knew that his act[s] or omissions were unlawful." *Id.* at 1283 ·(internal quotes omitted). Rejecting the defendants' contention that the government should have to prove their knowledge of the pertinent provisions of their discharge permit, the court concluded that "[t]he *International Minerals* rationale requires that we impute to these parties knowledge of their operating permit." *Id.* at 1285.

Hopkins's reliance on *Staples,* — U.S. ——, 114 S.Ct. 1793, and on *Posters 'N' Things, Ltd. v. United States,* — U.S. ——, ——–——, 114 S.Ct. 1747, 1753–54, 128 L.Ed.2d 539 (1994), for the contrary proposition is misplaced. *Staples* involved 26 U.S.C. § 5861(d) (1988), which prohibits the possession of unregistered machine guns and does not specify a *mens rea* element. The defendant had unsuccessfully requested an instruction that the jury, in order to convict, must find that he knew the weapon he possessed would fire automatically; the court of appeals affirmed his conviction on the ground that the government was not required to prove a defendant's knowledge of a weapon's physical characteristics. The Supreme Court reversed the conviction, ruling that the defendant could not properly be convicted unless the government proved that he knew the nature of his acts. — U.S. at ——, 114 S.Ct. at 1804. The Court in no way suggested, however, that the government had the burden of proving that the defendant also knew that his acts violated § 5861(d).

*Posters 'N' Things* also involved prosecution under a statutory provision that contained no express *mens rea* element, to wit, 21 U.S.C. § 857(a)(1) (1988) (repealed 1990), which prohibited "use of . . . [an] interstate conveyance as part of a scheme to sell drug paraphernalia." The Court concluded that the section was intended to require proof of knowledge that the merchandise sold would probably be used with drugs, but not proof of knowledge that the merchandise was within the statutory definition of "drug parapherna-

lia." —— U.S. at ——–——, 114 S.Ct. at 1753–54.

In sum, we conclude for the foregoing reasons that the trial court correctly instructed the jury that in a prosecution under § 1319(c)(2)(A), the government was required to prove that Hopkins knew the nature of his acts and performed them intentionally, but was not required to prove that he knew that those acts violated the CWA, or any particular provision of that law, or the regulatory permit issued to Spirol.

### 2. The Meaning of "Knowingly" in § 1319(c)(4)

■ We reach the same conclusion with respect to subsection (4) of § 1319(c), whose violation was alleged in count one of the indictment. That section provides, in pertinent part, that

> [a]ny person who ... *knowingly* falsifies, tampers with, or renders inaccurate any monitoring device or method *required to be maintained under this chapter*, shall [be guilty of a felony].

33 U.S.C. § 1319(c)(4) (emphasis added). Though Hopkins contends that the district court should have instructed the jury that it could not find him guilty of violating this section unless he knew that accurate maintenance of the monitoring methods was required by the CWA, a term that appears in several places in the same statute should generally be construed "the same way each time it appears," *Ratzlaf v. United States*, —— U.S. at ——, 114 S.Ct. at 660. Accordingly, we reject Hopkins's § 1319(c)(4) challenge for the reasons stated above with respect to the "knowingly" element of § 1319(c)(2)(A).

In light of our rejection of Hopkins's contentions concerning the knowledge requirements of §§ 1319(c)(2)(A) and (c)(4), his similar challenge to the district court's instruction on the conspiracy count is also without merit.

### 3. The Negligence Contention

■ Hopkins also contends that the jury, consistent with the trial court's instructions, could have convicted him for conduct that was merely negligent or innocent. In light of the court's actual instructions and the evidence presented, this contention is meritless. With respect to count one, for example, the court instructed, *inter alia*, that the government was required to prove that Hopkins had a high degree of awareness that the testing process was being tampered with, and prove that he "did not [falsify or tamper with that process] by mistake, accident or other innocent reason" (Tr. at 286), and that "[a] showing of negligence, mistake or even foolishness on the part of the defendant is not enough to support an inference of knowledge" (*id.* at 285). With respect to count two, the court similarly instructed that the government was required to prove that Hopkins had "acted voluntarily or intentionally and not by mistake, accident, ignorance of the facts, or for other innocent reason." (*Id.* at 288.)

Nor did the evidence show conduct that was merely negligent. Rather, the evidence and testimony at trial overwhelmingly indicated both that Hopkins was aware of the permit requirements and that he knew that numerous samples of Spirol's wastewater discharge contained concentrations of zinc in excess of the permitted levels. In his capacity as a corporate officer, Hopkins had signed the 1987 consent order imposing detailed discharge limitations; the February 1989 permit modification had been sent to Spirol to the attention of Hopkins; and Hopkins had sole corporate responsibility for supervising the Spirol wastewater testing program throughout the relevant period. In carrying out that supervision, Hopkins repeatedly warned Morrison when the zinc concentrations in a sample were "close to the borderline," repeatedly sent Morrison back for cleaner samples, and specifically alluded to the one-milligram-per-liter permit limitation by telling Morrison to "make sure it doesn't go over one." (Tr. 100.)

We see no possibility that the jury could have convicted Hopkins solely for negligence.

### B. The Conscious–Avoidance Instruction

■ Hopkins also challenges the district court's instruction that the jury could find that Hopkins had the equivalent of knowl-

edge if it found that "there was a high probability that employees of Spirol were tampering with a monitoring device or method but [Hopkins] deliberately and consciously avoided confirming this fact so that he could deny knowledge if apprehended." Hopkins argues that such an instruction was inappropriate because it was contrary to the government's contention that he had actual knowledge. His challenge has no merit.

A conscious-avoidance charge is appropriate when (a) the element of knowledge is in dispute, and (b) the evidence would permit a rational juror to conclude beyond a reasonable doubt "that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact," *United States v. Rodriguez*, 983 F.2d 455, 458 (2d Cir.1993). *See generally United States v. Civelli*, 883 F.2d 191, 194–95 (2d Cir.), *cert. denied*, 493 U.S. 966, 110 S.Ct. 409, 107 L.Ed.2d 374 (1989). Such an instruction is not inappropriate merely because the government has primarily attempted to prove that the defendant had actual knowledge, while urging in the alternative that if the defendant lacked such knowledge it was only because he had studiously sought to avoid knowing what was plain. *See, e.g., United States v. Mang Sun Wong*, 884 F.2d 1537, 1541 (2d Cir.1989), *cert. denied*, 493 U.S. 1082, 110 S.Ct. 1140, 107 L.Ed.2d 1045 (1990).

Both prerequisites for a conscious-avoidance instruction were present here. Though Hopkins did not testify at trial, his knowledge plainly was in dispute, for the thrust of his cross-examination and arguments was that he did not know about the tampering. For example, in his closing argument, defense counsel argued that Hopkins could have corrected matters "if [he] had known what was going on." (Tr. at 253.) Further, though there was ample evidence that Hopkins himself had ordered the tampering with the samples that were to be sent to the laboratory, there was also evidence that he had studiously avoided confirming the tampering. Morrison testified, for example, that on 25–30 occasions when he presented Hopkins with satisfactory samples after having previously presented him with unsatisfactory samples, Hopkins said, "I know nothing, I hear nothing." In light of Hopkins's litigation position and the evidence at trial, the district court did not err in instructing the jury that it could find Hopkins guilty based upon his conscious attempt to avoid actual knowledge that the samples had been falsified.

## CONCLUSION

We have considered all of Hopkins's arguments on this appeal and have found them to be without merit. The judgment of conviction is affirmed.