**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 95-20627
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

ATTIQUE AHMAD,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Southern District of Texas
_____

November 27, 1996

Before POLITZ, Chief Judge, SMITH and DUHÉ, Circuit Judges.

JERRY E. SMITH, Circuit Judge:


Attique Ahmad appeals his conviction of, and sentence for, criminal violations of the Clean Water Act ("CWA"). Concluding that the district court erred in its instructions to the jury, we reverse and remand.


I.

This case arises from the discharge of a large quantity of

gasoline into the sewers of Conroe, Texas, in January 1994. In 1992, Ahmad purchased the "Spin-N-Market No. 12," a combination convenience store and gas station located at the intersection of Second and Lewis Streets in Conroe. The Spin-N-Market has two gasoline pumps, each of which is fed by an 8000-gallon underground gasoline tank. Some time after Ahmad bought the station, he discovered that one of the tanks, which held high-octane gasoline, was leaking. This did not pose an immediate hazard, because the leak was at the top of the tank; gasoline could not seep out. The leak did, however, allow water to enter into the tank and contaminate the gas. Because water is heavier than gas, the water sank to the bottom of the tank, and because the tank was pumped from the bottom, Ahmad was unable to sell from it.

In October 1993, Ahmad hired CTT Environmental Services ("CTT"), a tank testing company, to examine the tank. CTT determined that it contained approximately 800 gallons of water, and the rest mostly gasoline. Jewel McCoy, a CTT employee, testified that she told Ahmad that the leak could not be repaired until the tank was completely emptied, which CTT offered to do for 65¢ per gallon plus $65 per hour of labor. After McCoy gave Ahmad this estimate, he inquired whether he could empty the tank himself. She replied that it would be dangerous and illegal to do so. On her testimony, he responded, "Well, if I don't get caught, what then?"

On January 25, 1994, Ahmad rented a hand-held motorized water

2

pump from a local hardware store, telling a hardware store employee that he was planning to use it to remove water from his backyard. Victor Fonseca, however, identified Ahmad and the pump and testified that he had seen Ahmad pumping gasoline into the street. Oscar Alvarez stated that he had seen Ahmad and another person discharging gasoline into a manhole. Tereso Uribe testified that he had confronted Ahmad and asked him what was going on, to which Ahmad responded that he was simply removing the water from the tank.

In all, 5,220 gallons of fluid were pumped from the leaky tank, of which approximately 4,690 gallons were gasoline. Some of the gas-water mixture ran down Lewis Street and some into the manhole in front of the store.

The gasoline discharged onto Lewis Street went a few hundred feet along the curb to Third Street, where it entered a storm drain and the storm sewer system and flowed through a pipe that eventually empties into Possum Creek. When city officials discovered the next day that there was gasoline in Possum Creek, several vacuum trucks were required to decontaminate it. Possum Creek feeds into the San Jacinto River, which eventually flows into Lake Houston.

The gasoline that Ahmad discharged into the manhole went a different route: It flowed through the sanitary sewer system and

eventually entered the city sewage treatment plant.[1] On January 26, employees at the treatment plant discovered a 1,000-gallon pool of gasoline in one of the intake ponds. To avoid shutting down the plant altogether, they diverted the pool of gasoline and all incoming liquid into a 5,000,000-gallon emergency lagoon.

The plant supervisor ordered that non-essential personnel be evacuated from the plant and called firefighters and a hazardous materials crew to the scene. The Conroe fire department determined the gasoline was creating a risk of explosion and ordered that two nearby schools be evacuated. Although no one was injured as a result of the discharge, fire officials testified at trial that Ahmad had created a "tremendous explosion hazard" that could have led to "hundreds, if not thousands, of deaths and injuries" and millions of dollars of property damage.

By 9:00 a.m. on January 26, investigators had traced the source of the gasoline back to the manhole directly in front of the Spin-N-Market. Their suspicions were confirmed when they noticed a strong odor of gasoline and saw signs of corrosion on the asphalt surrounding the manhole. The investigators questioned Ahmad, who at first denied having operated a pump the previous night. Soon, however, his story changed: He admitted to having used a pump but

---

[1] Conroe's sanitary sewer system is completely independent of its storm sewer system; the two serve different purposes, empty into different locations, and share no common pipes.

4

denied having pumped anything from his tanks.

Ahmad was indicted for three violations of the CWA: knowingly discharging a pollutant from a point source into a navigable water of the United States without a permit, in violation of 33 U.S.C. §§ 1311(a) and 1319(c)(2)(A) (count one); knowingly operating a source in violation of a pretreatment standard, in violation of 33 U.S.C. §§ 1317(d) and 1319(c)(2)(A) (count two); and knowingly placing another person in imminent danger of death or serious bodily injury by discharging a pollutant, in violation of 33 U.S.C. § 1319(c)(3) (count three). At trial, Ahmad did not dispute that he had discharged gasoline from the tank or that eventually it had found its way to Possum Creek and the sewage treatment plant. Instead, he contended that his discharge of the gasoline was not "knowing," because he had believed he was discharging water.

One of the key pieces of evidence Ahmad attempted to introduce in support of this theory was the testimony of Mohammed Abassi and Shahid Latif, who would have told the jury that Ahmad was at the Spin-N-Market only until 7:30 or 8:00 p.m. on January 25, and not the entire evening as the government contended. The gist of this was an attempt to show that Ahmad did not knowingly discharge gasoline himself, but rather only negligently left the pump in the hands of his employees. The district court found Abassi's and Latif's testimony irrelevant and excluded it. The jury found Ahmad guilty on counts one and two and deadlocked on count three.

5

II.

Ahmad argues that the district court improperly instructed the jury on the *mens rea* required for counts one and two.  The instruction on count one stated in relevant part:

> For you to find Mr. Ahmad guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:
>
> (1)  That on or about the date set forth in the indictment,
>
> (2)  the defendant knowingly discharged
>
> (3)  a pollutant
>
> (4)  from a point source
>
> (5)  into the navigable waters of the United States
>
> (6)  without a permit to do so.

On count two, the court instructed the jury:

> In order to prove the defendant guilty of the offense charged in Count 2 of the indictment, the government must prove beyond a reasonable doubt each of the following elements:
>
> (1)  That on or about the date set forth in the indictment
>
> (2)  the defendant,
>
> (3)  who was the owner or operator of a source,
>
> (4)  knowingly operated that source by discharging into a public sewer system or publicly owned treatment works
>
> (5)  a pollutant that created a fire or explosion hazard

6

> in that public sewer system or publicly owned
> treatment works.

Ahmad contends that the jury should have been instructed that the statutory *mens rea*§§knowledge§§was required as to each element of the offenses, rather than only with regard to discharge or the operation of a source. Because Ahmad requested such instruction, we review the refusal to give it for abuse of discretion.

Under this standard, we will affirm if the charge, viewed in its entirety, is a correct statement of the law that plainly instructs jurors on the relevant principles of law. *United States v. Allibhai*, 939 F.2d 244, 251 (5th Cir. 1991), *cert. denied*, 502 U.S. 1072 (1992). We will reverse a conviction, on the other hand, if the instructions do not correctly state the law. *United States v. Gray*, 96 F.3d 769, 775 (5th Cir. 1996); *United States v. Townsend*, 31 F.3d 262, 270 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 773 (1995). The matter of to which elements of the offenses the word "knowingly" applies is a question of pure statutory construction that we review *de novo*. *United States v. Snyder*, 930 F.2d 1090, 1093 (5th Cir.), *cert. denied*, 502 U.S. 942 (1991).

The language of the CWA is less than pellucid. Title 33 U.S.C. § 1319(c)(2)(A) says that "any person who knowingly violates" any of a number of other sections of the CWA commits a felony. One of the provisions that § 1319(c)(2)(A) makes it unlawful to violate is § 1311(a), which, when read together with a

7

series of definitions in § 1362, prohibits the addition of any pollutant to navigable waters from a "point source." That was the crime charged in count one. Section 1319(c)(2)(A) also criminalizes violations of § 1317(d), which prohibits the operation of any "source" in a way that contravenes any effluent standard, prohibition, or pretreatment standard. That was the crime charged in count two.

The principal issue is to which elements of the offense the modifier "knowingly" applies. The matter is complicated somewhat by the fact that the phrase "knowingly violates" appears in a different section of the CWA from the language defining the elements of the offenses. Ahmad argues that within this context, "knowingly violates" should be read to require him knowingly to have acted with regard to each element of the offenses. The government, in contrast, contends that "knowingly violates" requires it to prove only that Ahmad knew the nature of his acts and that he performed them intentionally. Particularly at issue is whether "knowingly" applies to the element of the discharge's being a pollutant, for Ahmad's main theory at trial was that he thought he was discharging water, not gasoline.

The Supreme Court has spoken to this issue in broad terms. In *United States v. X-Citement Video, Inc.*, 115 S. Ct. 464, 467 (1994), the Court read "knowingly" to apply to each element of a child pornography offense, notwithstanding its conclusion that

under the "most natural grammatical reading" of the statute it should apply only to the element of having transported, shipped, received, distributed, or reproduced the material at issue. The Court also reaffirmed the long-held view that "the presumption in favor of a scienter requirement should apply to each of the statutory elements which criminalize otherwise innocent conduct." *Id.* at 469.

Although *X-Citement Video* is the Court's most recent pronouncement on this subject, it is not the first. In *Staples v. United States*, 511 U.S. 600, 619-20 (1994), the Court found that the statutes criminalizing knowing possession of a machinegun, 26 U.S.C. §§ 5845(a)(6) and 5861(d), require that defendants know not only that they possess a firearm but that it actually is a machinegun. Thus, an awareness of the features of the gunSSspecifically, the features that make it an automatic weaponSSis a necessary element of the offense.[2] More generally, the Court also made plain that statutory crimes carrying severe penalties are presumed to require that a defendant know the facts that make his conduct illegal. *Id.*

Our own precedents are in the same vein. In *United States v. Baytank (Houston), Inc.*, 934 F.2d 599, 613 (5th Cir. 1991), we concluded that a conviction for knowing and improper storage of hazardous wastes under 42 U.S.C. § 6928(d)(2)(A) requires "that the

---

[2] *Accord United States v. Anderson*, 885 F.2d 1248 (5th Cir. 1989) (en banc).

defendant know[] factually what he is doing§§storing, what is being stored, and that what is being stored factually has the potential for harm to others or the environment, and that he has no permit . . . ." This is directly analogous to the interpretation of the CWA that Ahmad urges upon us. Indeed, we find it eminently sensible that the phrase "knowingly violates" in § 1319(c)(2)(A), when referring to other provisions that define the elements of the offenses § 1319 creates, should uniformly require knowledge as to each of those elements rather than only one or two. To hold otherwise would require an explanation as to why some elements should be treated differently from others, which neither the parties nor the caselaw seems able to provide.

In support of its interpretation of the CWA, the government cites cases from other circuits. We find these decisions both inapposite and unpersuasive on the point for which they are cited. In *United States v. Hopkins*, 53 F.3d 533, 537-41 (2d Cir. 1995), *cert. denied*, 116 S. Ct. 773 (1996), the court held that the government need not demonstrate that a § 1319(c)(2)(A) defendant knew his acts were illegal. The illegality of the defendant's actions is not an element of the offense, however. In *United States v. Weitzenhoff*, 35 F.3d 1275 (9th Cir. 1994), *cert. denied*, 115 S. Ct. 939 (1995), the court similarly was concerned almost exclusively with whether the language of the CWA creates a mistake-of-law defense. Both cases are easily distinguishable, for neither

10

directly addresses mistake of fact or the statutory construction issues raised by Ahmad.

The government also protests that CWA violations fall into the judicially-created exception for "public welfare offenses," under which some regulatory crimes have been held not to require a showing of *mens rea*. On its face, the CWA certainly does appear to implicate public welfare.

As recent cases have emphasized, however, the public welfare offense exception is narrow. The *Staples* Court, for example, held that the statute prohibiting the possession of machineguns fell outside the exception, notwithstanding the fact that "[t]ypically, our cases recognizing such offenses involve statutes that regulate potentially harmful or injurious items." *Staples*, 511 U.S. at 607 (citation omitted).

Though gasoline is a "potentially harmful or injurious item," it is certainly no more so than are machineguns. Rather, *Staples* held, the key to the public welfare offense analysis is whether "dispensing with *mens rea* would require the defendant to have knowledge only of traditionally lawful conduct." *Id.* at 618. The CWA offenses of which Ahmad was convicted have precisely this characteristic, for if knowledge is not required as to the nature of the substance discharged, one who honestly and reasonably believes he is discharging water may find himself guilty of a felony if the substance turns out to be something else.

11

The fact that violations of § 1319(c)(2)(A) are felonies punishable by years in federal prison confirms our view that they do not fall within the public welfare offense exception. As the *Staples* Court noted, public welfare offenses have virtually always been crimes punishable by relatively light penalties such as fines or short jail sentences, rather than substantial terms of imprisonment. *Id.* at 1802-03. Serious felonies, in contrast, should not fall within the exception "absent a clear statement from Congress that *mens rea* is not required." *Id.* at 618. Following *Staples*, we hold that the offenses charged in counts one and two are not public welfare offenses and that the usual presumption of a *mens rea* requirement applies. With the exception of purely jurisdictional elements, the *mens rea* of knowledge applies to each element of the crimes.

Finally, the government argues that the instructions, considered as a whole, adequately conveyed to the jury the message that Ahmad had to have known that what he was discharging was gasoline in order for the jury to find him guilty. We disagree.

At best, the jury charge made it uncertain to which elements "knowingly" applied. At worst, and considerably more likely, it indicated that only the element of discharge need be knowing. The instructions listed each element on a separate line, with the word "knowingly" present only in the line corresponding to the element that something was discharged. That the district court included a

12

one-sentence summary of each count in which "knowingly" was present did not cure the error.

The obvious inference for the jury was that knowledge was required only as to the fact that something was discharged, and not as to any other fact. In effect, with regard to the other elements of the crimes, the instructions implied that the requisite *mens rea* was strict liability rather than knowledge.

There was at least a reasonable likelihood that the jury applied the instructions in this way, *see Victor v. Nebraska*, 511 U.S. 1, 6 (1994), so we conclude that the instructions misled the jury as to the elements of the offense. Because the charge effectively withdrew from the jury's consideration facts that it should have been permitted to find or not find, this error requires reversal.

### III.

Having found reversible error in the instructions, we need not consider Ahmad's other arguments. Given that this case likely will be tried again, however, we will address, in the interest of judicial economy, the exclusion of two of Ahmad's witnesses.

Ahmad argues that the district court improperly excluded the testimony of two individuals who would have testified that he was not at the Spin-N-Market from approximately 7:30 or 8:00 p.m. on January 25 through 12:45 a.m. on January 26. These witnesses,

13

Mohammed Abassi and Shahid Latif, were intended to support Ahmad's theory that he started the pump and left the Spin-N-Market shortly thereafter, in contrast to the government's theory that he was there all evening. They were not intended to show that he had been completely uninvolved in the incident. Whether Ahmad pumped at least *some* of the fluid was not in issue; his counsel conceded at trial that "he started it [the pump] off."

The first of these witnesses was Abassi, to whose testimony the government objected on the ground that it tended to establish an alibi. After some confusion over whether the defense was required to give the government notice of alibi under FED. R. CRIM. P. 12.1(a),[3] Ahmad's counsel settled on the argument that Abassi's testimony was not being offered as an alibi, but rather only to show that Ahmad had left the store during the evening in question. This, he argued, would support the theory that Ahmad's violation had been negligent rather than knowing, in the sense that he negligently left the store in the care of his untrained employees. The court responded that because it did not intend to give an instruction on the lesser included offense of a negligent violation, Abassi's testimony was irrelevant, and excluded it on that ground.[4]

Our examination of the exclusion of evidence is limited to the

---

[3] It was not; the government did not request such notice.

[4] Ahmad ultimately requested, and the court denied, a lesser included offense instruction on each of the charged crimes.

grounds that were proffered for its admission at trial. *See, e.g.,*
*United States v. Mejia*, 844 F.2d 209, 214-15 (5th Cir. 1988).
Given the basis on which Abassi's testimony was offered, the only
way in which it could have been relevant was to support a theory of
negligent rather than knowing violation.  This in turn means that
the testimony was irrelevant unless Ahmad was entitled to an
instruction on the lesser included offense.  If he was not so
entitled, the evidence was properly excluded.  We conclude to the
contrary.

In *Sansone v. United States*, 380 U.S. 343, 350 (1965), the
Court held that a defendant is entitled to have the jury instructed
on a lesser included offense if there is an evidentiary basis that
would allow a finding of guilt of the lesser offense and "the
charged greater offense requires the jury to find a disputed
factual element which is not required for conviction of the lesser-
included offense."  Thus the test we apply for whether the
instruction should be given is two-pronged: "(1) [T]he elements of
the lesser offense must be a subset of the elements of the charged
offense; and (2) the evidence at trial must be such that a jury
could rationally find the defendant guilty of the lesser offense,
yet acquit him of the greater."[5]

---

[5] *United States v. Browner*, 889 F.2d 549, 550-51 (5th Cir. 1989) (citing
*Schmuck v. United States*, 489 U.S. 705, 715-16 & n.8 (1989)), *appeal after remand*,
937 F.2d 165 (5th Cir. 1991).  *See also United States v. Harrison*, 55 F.3d 163, 166
(5th Cir. 1995), *cert. denied*, 116 S. Ct. 324 (1995); *United States v. Deisch*, 20
F.3d 139, 142 (5th Cir. 1994).

It is self-evident that Ahmad met the first prong of the test, for knowing violations of §§ 1311 and 1317(d) require everything that negligent violations do, and more. The second prong, however, is less easily disposed of.

The district court's instructions and its rulings on Ahmad's proposed instructions indicate that it thought "knowingly" modified only the element that something was discharged. Were this the correct interpretation of the CWA, the lesser included offense instruction would have been correctly denied, because no rational jury simultaneously could have found both (1) that Ahmad did not *know* that he was operating the pump and (2) that he was *negligent* with regard to whether he was operating it. Indeed, on the facts as presented, the idea that Ahmad could have been negligent with regard to whether a pump was being operated is almost nonsensical.

With regard to the other elements of the crime, however, there is a vivid and sensible distinction between negligence and knowledge. Having held that the district court's interpretation of the CWA was incorrect, we also must conclude that it erred in refusing to give the lesser included offense instruction. Because the statutory *mens rea* applies to multiple elements of the offense, such as whether what was being discharged was a pollutant, there was ample evidence to support the lesser violation.

Most of Ahmad's defense, after all, was built around the idea that he thought water, rather than gasoline, was being discharged.

16

A rational jury could so have found, and at the same time could have found that he did not *actually know* that he was pumping gas. Because the lesser included offense instruction was improperly denied, Abassi's and Latif's testimony was improperly excluded as well. We remand with instruction that, if this case is retried, the admissibility of this testimony be reconsidered in light of the foregoing.

## IV.

Because we reverse Ahmad's convictions, we need not address his sentencing claims. The convictions are REVERSED and the case REMANDED.