**United States Court of Appeals**

**FOR THE EIGHTH CIRCUIT**

_____

No. 96-3962

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | Appeals from the United States |
| | * | District Court for the District |
| v. | * | of South Dakota. |
| | * | |
| Timothy J. Sinskey, | * | |
| | * | |
| Appellant. | * | |

_____

No. 96-3965

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Wayne Kumm, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: May 20, 1997

Filed: July 11, 1997
_____

Before RICHARD S. ARNOLD, Chief Judge, and BOWMAN and MORRIS
SHEPPARD ARNOLD, Circuit Judges.
_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

The defendants appeal their convictions for criminal violations of the Clean Water Act. We affirm the judgments of the trial court.[1]

I.

In the early 1990s, Timothy Sinskey and Wayne Kumm were, respectively, the plant manager and plant engineer at John Morrell & Co. ("Morrell"), a large meat-packing plant in Sioux Falls, South Dakota. The meat-packing process created a large amount of wastewater, some of which Morrell piped to a municipal treatment plant and the rest of which it treated at its own wastewater treatment plant ("WWTP"). After treating wastewater at the WWTP, Morrell would discharge it into the Big Sioux River.

One of the WWTP's functions was to reduce the amount of ammonia nitrogen in the wastewater discharged into the river, and the Environmental Protection Agency ("EPA") required Morrell to limit that amount to levels specified in a permit issued under the Clean Water Act ("CWA"), see 33 U.S.C. §§ 1251-1387. As well as

_____

[1]The Honorable Lawrence L. Piersol, United States District Judge for the District of South Dakota.

specifying the acceptable levels of ammonia nitrogen, the permit also required Morrell to perform weekly a series of tests to monitor the amounts of ammonia nitrogen in the discharged water and to file monthly with the EPA a set of reports concerning those results.

In the spring of 1991, Morrell doubled the number of hogs that it slaughtered and processed at the Sioux Falls plant. The resulting increase in wastewater caused the level of ammonia nitrate in the discharged water to be above that allowed by the CWA permit. Ron Greenwood and Barry Milbauer, the manager and assistant manager, respectively, of the WWTP, manipulated the testing process in two ways so that Morrell would appear not to violate its permit. In the first technique, which the parties frequently refer to as "flow manipulation" or the "flow game," Morrell would discharge extremely low levels of water (and thus low levels of ammonia nitrogen) early in the week, when Greenwood and Milbauer would perform the required tests. After the tests had been performed, Morrell would discharge an exceedingly high level of water (and high levels of ammonia nitrogen) later in the week. The tests would therefore not accurately reflect the overall levels of ammonia nitrogen in the discharged water. In addition to manipulating the flow, Greenwood and Milbauer also engaged in what the parties call "selective sampling," that is, they performed more than the number of tests required by the EPA but reported only the tests showing acceptable levels of ammonia nitrogen. When manipulating the flow and selective sampling failed to yield the required number of tests showing acceptable levels of ammonia nitrogen, the two simply falsified the test results and the monthly EPA reports, which Sinskey then signed and sent to the EPA. Morrell submitted false reports for every month but one from August, 1991, to December, 1992.

As a result of their participation in these activities, Sinskey and Kumm were charged with a variety of CWA violations. After a three-week trial, a jury found Sinskey guilty of eleven of the thirty counts with which he was charged, and Kumm guilty of one of the seventeen counts with which he was charged. In particular, the jury

found both Sinskey and Kumm guilty of knowingly rendering inaccurate a monitoring method required to be maintained under the CWA, in violation of 33 U.S.C. § 1319(c)(4), and Sinskey guilty of knowingly discharging a pollutant into waters of the United States in amounts exceeding CWA permit limitations, in violation of 33 U.S.C. § 1319(c)(2)(A); see also 33 U.S.C. § 1311(a).  Each appeals his conviction.

## II.

Sinskey first challenges the jury instructions that the trial court gave with respect to 33 U.S.C. § 1319(c)(2)(A), which, among other things, punishes anyone who "knowingly violates" § 1311 or a condition or limitation contained in a permit that implements § 1311.  That section of the CWA prohibits the discharge of pollutants except in compliance with, among other provisions, § 1342, which establishes the National Pollutant Discharge Elimination System ("NPDES").  The NPDES authorizes the EPA to issue permits that allow the discharge of certain pollutants within specified limitations and with specified reporting and monitoring conditions.  As applied in this case, § 1319(c)(2)(A) therefore prohibits the discharge of pollutants in amounts exceeding the limitations specified in an NPDES permit.

The trial court gave an instruction, which it incorporated into several substantive charges, that in order for the jury to find Sinskey guilty of acting "knowingly," the proof had to show that he was "aware of the nature of his acts, perform[ed] them intentionally, and [did] not act or fail to act through ignorance, mistake, or accident."  The instructions also told the jury that the government was not required to prove that Sinskey knew that his acts violated the CWA or permits issued under that act.  Sinskey contests these instructions as applied to 33 U.S.C. § 1319(c)(2)(A), arguing that because the adverb "knowingly" immediately precedes the verb "violates," the government must prove that he knew that his conduct violated either the CWA or the NPDES permit.  We disagree.

-4-

Although our court has not yet decided whether 33 U.S.C. § 1319(c)(2)(A) requires the government to prove that a defendant knew that he or she was violating either the CWA or the relevant NPDES permit when he or she acted, we are guided in answering this question by the generally accepted construction of the word "knowingly" in criminal statutes, by the CWA's legislative history, and by the decisions of the other courts of appeals that have addressed this issue. In construing other statutes with similar language and structure, that is, statutes in which one provision punishes the "knowing violation" of another provision that defines the illegal conduct, we have repeatedly held that the word "knowingly" modifies the acts constituting the underlying conduct. See United States v. Farrell, 69 F.3d 891, 893 (8th Cir. 1995), cert. denied, 116 S. Ct. 1283 (1996), and United States v. Hern, 926 F.2d 764, 766-68 (8th Cir. 1991).

In Farrell, 69 F.3d at 892-93, for example, we discussed 18 U.S.C. § 924(a)(2), which penalizes anyone who "knowingly violates" § 922(o)(1), which in turn prohibits the transfer or possession of a machine gun. In construing the word "knowingly," we held that it applied only to the conduct proscribed in § 922(o)(1), that is, the act of transferring or possessing a machine gun, and not to the illegal nature of those actions. A conviction under § 924(a)(2) therefore did not require proof that the defendant knew that his actions violated the law.

We see no reason to depart from that commonly accepted construction in this case, and we therefore believe that in 33 U.S.C. § 1319(c)(2)(A), the word "knowingly" applies to the underlying conduct prohibited by the statute. Untangling the statutory provisions discussed above in order to define precisely the relevant underlying conduct, however, is not a little difficult. At first glance, the conduct in question might appear to be violating a permit limitation, which would imply that § 1319(c)(2)(A) requires proof that the defendant knew of the permit limitation and knew that he or she was violating it. To violate a permit limitation, however, one must engage in the conduct prohibited by that limitation. The permit is, in essence, another layer of regulation in

the nature of a law, in this case, a law that applies only to Morrell. We therefore believe that the underlying conduct of which Sinskey must have had knowledge is the conduct that is prohibited by the permit, for example, that Morrell's discharges of ammonia nitrates were higher than one part per million in the summer of 1992. Given this interpretation of the statute, the government was not required to prove that Sinskey knew that his acts violated either the CWA or the NPDES permit, but merely that he was aware of the conduct that resulted in the permit's violation.

This interpretation comports not only with our legal system's general recognition that ignorance of the law is no excuse, see Cheek v. United States, 498 U.S. 192, 199 (1991), but also with Supreme Court interpretations of statutes containing similar language and structure. In United States v. International Minerals & Chemical Corp., 402 U.S. 558 (1971), for example, the Court analyzed a statute that punished anyone who "knowingly violate[d]" certain regulations pertaining to the interstate shipment of hazardous materials. In holding that a conviction under the statute at issue did not require knowledge of the pertinent law, the Court reasoned that the statute's language was merely a shorthand designation for punishing anyone who knowingly committed the specific acts or omissions contemplated by the regulations at issue, and that the statute therefore required knowledge of the material facts but not the relevant law. Id. at 562-63. The Court also focused on the nature of the regulatory scheme at issue, noting that where "dangerous or ... obnoxious waste materials" are involved, anyone dealing with such materials "must be presumed" to be aware of the existence of the regulations. Id. at 565. Requiring knowledge only of the underlying actions, and not of the law, would therefore raise no substantial due process concerns. Id. at 564-65. Such reasoning applies with equal force, we believe, to the CWA, which regulates the discharge into the public's water of such "obnoxious waste materials" as the byproducts of slaughtered animals.

The act's legislative history, moreover, supports our view of the mens rea required for conviction under 33 U.S.C. § 1319(c)(2)(A). In 1987, Congress amended

the act, in part to increase deterrence by strengthening the criminal sanctions for its violation.  See, e.g., H.R. Conf. Rep. No. 99-1004 at 138 (1986) and S. Rep. No. 99-50 at 29-30 (1985).  To that end, Congress changed the term "willfully" to "knowingly" in that section of the act dealing with intentional violations.  See 133 Cong. Rec. H131 (daily ed. Jan. 7, 1987) (statement of Rep. J. Howard), reprinted in 1987 U.S.C.C.A.N. 5, 28, and 33 U.S.C. § 1319, historical and statutory notes, 1987 amendment, at 197 (West supp. 1997).  Although Congress did not explicitly discuss this change, it may logically be viewed as an effort to reduce the mens rea necessary for a conviction, as the word "willfully" generally connotes acting with the knowledge that one's conduct violates the law, while the word "knowingly" normally means acting with an awareness of one's actions.  Compare Cheek, 498 U.S. at 201, with International Minerals, 402 U.S. at 562-63.  See also  Babbitt v. Sweet Home Chapter of Communities, 115 S. Ct. 2407, 2412 n.9 (1995) (discussing change in Endangered Species Act from "willfully" to "knowingly"), and Hern, 926 F.2d at 767.

Our confidence in this interpretation is increased by decisions of the only other appellate courts to analyze the precise issue presented here.  See United States v. Hopkins, 53 F.3d 533, 541 (2d Cir. 1995), cert. denied, 116 S. Ct. 773 (1996), and United States v. Weitzenhoff, 35 F.3d 1275, 1283-86 (9th Cir. 1993), cert. denied, 115 S. Ct. 939 (1995).  Both cases held that 33 U.S.C. § 1319(c)(2)(A) does not require proof that the defendant knew that his or her acts violated the CWA or the NPDES permits at issue.

Contrary to the defendants' assertions, moreover, United States v. Ahmad, 101 F.3d 386 (5th Cir. 1996), is inapposite.  In Ahmad, 101 F.3d at 388, a convenience store owner pumped out an underground gasoline storage tank into which some water had leaked, discharging gasoline into city sewer systems and nearby creeks in violation of 33 U.S.C. § 1319(c)(2)(A).  At trial, the defendant asserted that he thought that he was discharging water, and that the statute's requirement that he act knowingly required that the government prove not only that he knew that he was discharging something,

but also that he knew that he was discharging gasoline. Id. at 390. The Fifth Circuit agreed, holding that a defendant does not violate the statute unless he or she acts knowingly with regard to each element of an offense. Id. at 391. Ahmad, however, involved a classic mistake-of-fact defense, and is not applicable to a mistake-of-law defense such as that asserted by Sinskey and Kumm. Indeed, the Fifth Circuit noted as much, distinguishing Hopkins, 53 F.3d at 533, and Weitzenhoff, 35 F.3d at 1275, on the grounds that those decisions involved a mistake-of-law defense. See Ahmad, 101 F.3d at 390-91.

Sinskey, joined by Kumm, also challenges the trial court's instructions with respect to 33 U.S.C. § 1319(c)(4), arguing that the government should have been required to prove that they knew that their acts were illegal. This argument has even less force with respect to § 1319(c)(4) -- which penalizes a person who "knowingly falsifies, tampers with, or renders inaccurate any monitoring device or method required to be maintained" by the CWA -- than it does with respect to § 1319(c)(2)(A). In § 1319(c)(4), the adverb "knowingly" precedes and explicitly modifies the verbs that describe the activities that violate the act.

We have repeatedly held that, in other statutes with similar language, the word "knowingly" refers only to knowledge of the relevant activities (in this case, the defendants' knowledge that they were rendering the monitoring methods inaccurate by aiding and abetting in the flow games and selective sampling). See, e.g., United States v. Hopkins, 53 F.3d at 541; United States v. Enochs, 857 F.2d 491, 492-94 (8th Cir. 1988), cert. denied, 490 U.S. 1022 (1989); and United States v. Udofot, 711 F.2d 831, 837 (8th Cir. 1983), cert. denied, 464 U.S. 896 (1983). Based on this well established constructional convention, and the equally well known principle that a term that appears in a statute more than once should ordinarily be construed the same way each time, Ratzlaf v. United States, 510 U.S. 135, 143 (1994), we see no reason to read a requirement that a defendant know of the illegal nature of his or her acts into 33 U.S.C. § 1319(c)(4). Contrary to the defendants' assertions, moreover, requiring the

government to prove only that the defendant acted with awareness of his or her conduct does not render § 1319(c)(4) a strict liability offense.

Sinskey also contends that the trial court abused its discretion by admitting into evidence Milbauer's "secret logs" -- that is, notes that Milbauer took in which he recorded the actual levels of ammonia nitrogen being discharged -- because the logs constituted expert scientific evidence that did not meet the threshold standards of accuracy and reliability. See Fed. R. Evid. 702 and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 594 (1993). Sinskey appears not to contest the fact that, in the abstract, the means of testing ammonia nitrogen levels that Milbauer used, an ammonia nitrate probe, was sufficiently accurate and reliable. Sinskey instead attacks the manner in which Milbauer used the probe, arguing that certain deviations by Milbauer from the standard protocol prescribed for using the probe rendered his results so unreliable as to negate, in this case, the probe's generally accepted accuracy and reliability. See, e.g., United States v. Johnson, 56 F.3d 947, 952-53 (8th Cir. 1995), and United States v. Martinez, 3 F.3d 1191, 1198 (8th Cir. 1993), cert. denied, 510 U.S. 1062 (1994).

After a careful review of the trial court's two-day hearing on this issue and the relevant testimony at trial, we find no error. Although Sinskey identified several practices of Milbauer that deviated from the standard protocol for use of the probe, the government produced testimony tending to show that these deviations did not affect the reliability of Milbauer's test results. Therefore, admitting the secret logs and allowing the jury to consider these deviations when deciding what weight to give the logs was, we believe, well within the trial court's discretion.

We similarly find no error in the trial court's decision not to grant Sinskey's motion seeking to limit severely the government's ability to cross-examine an unindicted co-conspirator. Although a trial court must strike a balance between a witness's fifth amendment privilege and the defendant's sixth amendment right to cross-

examination, see, e.g., United States v. Rubin, 836 F.2d 1096, 1099-1100 (8th Cir. 1988), there is no indication in the present case that the trial court failed properly to strike such a balance. Although the trial court refused to grant the requested motion, it indicated that it would be willing to consider other restrictions on the cross-examination's scope. After the defense suggested none, the trial court ruled that it would allow the witness, after direct examination, to invoke his fifth amendment privilege outside the presence of the jury. We believe that this ruling gave Sinskey everything that he requested, and more. The trial court therefore did not err in balancing the defendant's and the witness's rights in the manner that it chose.

### III.

Kumm attacks his conviction for violating 33 U.S.C. § 1319(c)(4) on a number of grounds, first among them the sufficiency of the government's evidence. Kumm claims that the government's evidence established only that he failed to stop others from rendering inaccurate Morrell's monitoring methods, not that he affirmatively participated in the deceit either directly or by aiding and abetting those who did. As Kumm correctly argues, to convict him of aiding and abetting the monitoring scheme, the government must prove more than his mere association with, and knowledge of the activities of, Greenwood, Milbauer, and Sinskey. United States v. Nunn, 940 F.2d 1128, 1131 (8th Cir. 1991). Instead, the government must show that Kumm associated himself with the misleading monitoring scheme, participated in it "as something [he] wished to bring about," and acted in such a way as to ensure its success. United States v. Hernandez, 986 F.2d 234, 238 (8th Cir. 1993), quoting United States v. Posters 'N' Things, Ltd., 969 F.2d 652, 661 (8th Cir. 1992), aff'd, 511 U.S. 513 (1994). Encouraging the perpetrators of a crime in their efforts to effect that crime is therefore aiding and abetting the commission of a crime. See Hernandez, 986 F.2d at 238, and Nunn, 940 F.2d at 1131.

After a careful review of the record in the light most favorable to the jury's verdict, see United States v. Baker, 98 F.3d 330, 338 (8th Cir. 1996), cert. denied, 117

S. Ct. 1456 (1997), we believe that the evidence against Kumm, although hardly overwhelming, is not so weak that no reasonable juror could have convicted him. See id. In particular, we believe that the evidence supports a verdict that he aided and abetted the misleading monitoring scheme by encouraging Greenwood to render Morrell's monitoring methods inaccurate and by discouraging him from complaining about it to others at the WWTP.

Kumm once reassured a worried Greenwood, for example, "not to worry about [the violations] because if we did get caught, Morrell's had enough lawyers and lobbyists that it wouldn't be a problem." Although Kumm knew of Greenwood's illegal activities, moreover, he praised Greenwood on employee evaluations and even recommended that Greenwood receive a raise. When Greenwood began complaining about the violations and campaigning for physical improvements at the WWTP to decrease future violations, Kumm silenced him. At a meeting of the plant's mechanical department, for example, Kumm told Greenwood that "[n]ow is not the time or the place to discuss those matters" when Greenwood raised the subject of the violations. Lastly, although Greenwood would "rant and rave" to Kumm several times a week about the permit violations and about getting the WWTP fixed, Kumm responded only by submitting to Morrell headquarters routine requests for future improvements that were similar to previous requests that had already been denied. We believe that these affirmative acts constitute sufficient evidence to support Kumm's conviction.

Kumm challenges the jury instructions on several grounds. In addition to the issue discussed above, Kumm asserts that the essence of the government's case was his failure to report the violations and to intervene to stop their continuation, that he had no such duties, and that the trial court therefore abused its discretion when it refused to give an instruction to the jury that Kumm had no affirmative legal duty to report violations of the CWA permits or to intervene to prevent them. Though such an instruction would certainly have been appropriate, after a careful review of the record

we see no abuse of discretion in the trial court's decision not to give the requested instruction, for the following reasons.

Contrary to Kumm's assertions, the government's case did not focus solely on Kumm's role as a supervisor and his failure to report the violations or to intervene. We note at the outset of this discussion that Kumm was neither charged with, nor convicted of, a failure to report CWA permit violations. Instead, he was charged with, and convicted of, "render[ing] inaccurate" the monitoring methods required under Morrell's CWA permit. See 33 U.S.C. § 1319(c)(4). Kumm argues, however, that the testimony of several witnesses and certain portions of the government's closing argument so emphasized his supervisory status and his inaction, that they led the jury to convict him for being an innocent bystander who merely failed to report the violations or to intervene. After a careful review of the statements at issue, in their full context, we disagree.

As we indicated above, the government sufficiently proved that Kumm actively encouraged the flow manipulation and selective sampling, thereby affirmatively participating in the misleading monitoring scheme. Presenting evidence that Kumm was a supervisor, that is, that he was in a position capable of giving rewards and reassurances, was but a necessary part of showing how he was able to encourage Greenwood. Likewise, testimony that Kumm neither reported nor interfered with the permit violations was consistent with the government's claim that Kumm was encouraging illegal activity. Contrary to Kumm's assertions, this evidence did not merely tend to show that Kumm violated some supposed duty to report permit violations; it tended instead to prove acts of concealment on Kumm's part that allowed the selective sampling scheme effectively to camouflage Morrell's violations.

Nor do we find reversible error in the prosecutor's closing argument. As Kumm points out, the prosecutor did, at times, argue that Sinskey and Kumm had "a duty" or "an obligation" to "protect the river" or "make sure that the plant operated in

compliance with the law."  In the context of the full closing argument, however, we believe that these statements refer not to legal duties, but rather to the duties of his job. And while the prosecutor did refer to what Kumm did not do, such as not reporting the violations and not interfering with them, these  references were always, as a rhetorical device, juxtaposed against what Kumm did do.   In context, we do not believe that these statements suggested to the jury that it could convict Kumm solely for the failure to report permit violations or the failure to intervene to stop them.

We do, however, believe that the prosecutor misstated the law when he told the jury, with respect to the violation of 33 U.S.C. § 1319(c)(4), that if "these two gentlemen knew that the selective sampling and the flow game was going on, they are guilty."  We note, though, not only that this statement was not objected to either during or after the argument in question, but also that we believe that the jury instructions sufficiently cured whatever unfair prejudice this statement may have created.  The trial court told the jury that it had to "follow the law as stated in these instructions," that it had to "follow my instructions on the law, even if you thought the law was different," and that "[i]t would be a violation of your sworn duty to base your verdict upon any rules of law other than the ones given you in these instructions."  The instructions relevant to § 1319(c)(4) defined accurately the elements of a violation of it and the elements of aiding and abetting, including the necessity that a defendant act knowingly. The aiding and abetting instructions, moreover, correctly told the jury that a defendant's mere presence at a crime scene or his mere association with the perpetrators of a violation was insufficient to prove that the defendant aided and abetted the commission of an offense.

## IV.

For the foregoing reasons, we affirm the convictions in all respects.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.