PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

D. J. COOPER,
*Defendant-Appellant.*

No. 05-4956

Appeal from the United States District Court
for the Western District of Virginia, at Lynchburg.
Norman K. Moon, District Judge.
(CR-04-6)

Argued: February 2, 2007

Decided: March 28, 2007

Before WILKINSON, MOTZ, and TRAXLER, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Motz and Judge Traxler joined.

## COUNSEL

**ARGUED:** Wayne D. Inge, Roanoke, Virginia, for Appellant. Michael Ray Fisher, ENVIRONMENTAL PROTECTION AGENCY, Washington, D.C., for Appellee. **ON BRIEF:** John L. Brownlee, United States Attorney, Jennie L. M. Waering, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellee.

**OPINION**

WILKINSON, Circuit Judge:

D. J. Cooper was convicted by a jury on nine counts of knowingly discharging a pollutant from a point source into waters of the United States, in violation of the Federal Water Pollution Control Act Amendments of 1972, as amended 33 U.S.C. § 1251 *et seq.* (2000), commonly known as the Clean Water Act ("CWA" or "the Act"). He claims that the district court should have granted an acquittal for lack of sufficient evidence, in part because the government failed to prove Cooper knew that he was discharging pollutants into waters of the United States. Because the district court did not err, and because the CWA does not require the government to establish Cooper's knowledge as to the jurisdictional status of the waters he affected, we affirm the judgment of the district court.

I.

The CWA prohibits the knowing discharge of a pollutant from a point source to waters of the United States without a permit. *See* 33 U.S.C. §§ 1311(a), 1319(c)(2)(A), 1362(7), 1362(12). The Act defines "discharge of a pollutant" as the "addition of any pollutant to navigable waters from any point source." *Id.* § 1362(12). The term "pollutant" includes "sewage . . . sewage sludge . . . [and] biological materials . . . discharged into water." *Id.* § 1362(6). The term "point source" denotes a "confined and discrete conveyance," including any pipe "from which pollutants are or may be discharged." *Id.* § 1362(14). "Navigable waters" are defined as "waters of the United States," *id.* § 1362(7), which are defined by regulation to include, among other things, "[a]ll interstate waters" and the "[t]ributaries of [such] waters," 40 C.F.R § 122.2 (2006).

Defendant Cooper has been operating a sewage lagoon at his trailer park in Bedford County, Virginia, since 1967. In recent times the lagoon has served as the only method of human waste disposal for twenty-two of the trailers in the park. The lagoon treats sewage according to the following process: Solid materials settle to the bottom of the lagoon, while the fluid level rises until it reaches an overflow structure in the middle of the lagoon, from which it flows

through a pipe into a chlorine contact tank. In the tank, an electric pump dispenses a solution of water and granular chlorine, which mixes with the sewage. The chlorinated fluid then flows through a discharge pipe, down a channel of a few feet, and thence into a small creek.

The creek into which the treated sewage flows is a tributary of Sandy Creek, which is in turn a tributary of the Roanoke River. The Roanoke River flows from the foothills of the Appalachian Mountains in Virginia, through North Carolina, and into the Albemarle Sound. There is no dispute that, as a tributary of an interstate water, the small creek into which the lagoon discharges constitutes a water of the United States. *See id.*

The CWA provides that permits regulating discharge of pollutants other than dredge and fill material are issued under the National Pollutant Discharge Elimination System program ("NPDES"). *See* 33 U.S.C. §§ 1342(a), 1344. It also provides that states may, upon EPA approval, choose to administer their own permit program in accordance with the CWA. *See id.* § 1342(b). The Commonwealth of Virginia maintains an EPA-approved Virginia Pollution Discharge Elimination System ("VPDES") program, pursuant to which the Virginia Department of Environmental Quality ("DEQ") issues permits that suffice for both state and federal discharge authorization. *See* Va. Code Ann. § 62.1-44.15(5a) (2006). DEQ regulated discharges from the lagoon through a series of permits to Cooper, the last of which issued in 1997 and remained in effect until March 7, 2002.

Cooper's permit regulated discharge from the lagoon in a number of ways. It fixed "effluent limitations" or permitted pollutant levels for various pollutants associated with sewage, and it set the degree to which the discharge was allowed to decrease oxygen levels in the creek. It required chlorination of the sewage in order to kill pathogens, as well as dechlorination, for which purpose DEQ instructed Cooper to install dechlorination facilities. The permit also required Cooper to sample the pollutant levels of the discharge and to report the results each month to DEQ.

Between 1993 and 1998, DEQ recorded over 300 violations of the permit, including excessive levels of Kjeldahl nitrogen, chlorine, and

suspended solids and impermissibly low levels of oxygen in the creek. In response, DEQ took enforcement action which culminated in a 1998 Consent Order. Under the Consent Order, Cooper agreed to pay a $5,000 fine for past violations. Given that the sewage lagoon was incapable of meeting CWA standards in its existing form, the Consent Order gave Cooper until August 2000 to choose among several courses of remedial action: (1) upgrading the lagoon; (2) replacing the lagoon with a self-contained treatment plant or a septic field, or (3) closing the twenty-two trailer lots served by the lagoon. The Consent Order gave Cooper until August 2002 to implement his chosen course of action.

After the Consent Order, discharges from the lagoon continued to violate the permit. DEQ inspections of the creek found a strong sewage smell, decreased oxygen levels, dark solids, and a proliferation of bloodworms, pollution-tolerant organisms that thrive in low-oxygen environments like that provided by raw sewage.

In August 2000, Cooper violated the 1998 Consent Order by failing to elect a course of remedial action by the established deadline. This resulted in a 2001 amendment to the Consent Order, which imposed a $2,000 fine, set a new deadline for a choice of remedy, and left in place the August 2002 implementation deadline. The amendment also set interim discharge limits that were less demanding than those of the 1997 permit but still deemed protective of the environment by DEQ.

In March 2002, Cooper's discharge permit expired with Cooper having failed to file the necessary paperwork to receive a new permit. After the expiration of the permit, DEQ treated the interim discharge limits in the 2001 amendment to the Consent Order as a "de facto permit," until Cooper again violated the Consent Order in August 2002. At that time, not only had Cooper failed to complete the required update to the lagoon, but the lagoon was still operating exactly as it had at the time of the 1998 Consent Order. In response, in October 2002 the State Water Control Board canceled the Consent Order, and DEQ notified Cooper that he was no longer operating with a valid discharge permit.

Nevertheless, discharges from the lagoon into the creek continued. DEQ sent Cooper many Notices of Violation and inspection reports

stating that he was discharging illegally. After an administrative hearing, DEQ in July 2003 issued an order imposing a $10,000 fine and ordering Cooper to cease discharging. Even after the order, the discharges continued, and DEQ continued to send Cooper inspection reports and Notices of Violation.

In late 2003, the U.S. Environmental Protection Agency's Criminal Investigation Division ("CID") began to investigate discharges from the lagoon. On various dates between August 2003 and October 2004, DEQ inspectors observed the lagoon, estimated the volume of the discharge, sampled the discharge's pH and total residual chlorine, collected samples for fecal coliform analysis, and completed inspection reports that were mailed to Cooper. A number of the samples were found to have the maximum quantifiable concentration of fecal coliform, a type of bacteria present in human feces.

On October 29, 2003, in an interview with CID Special Agent Matthew Goers, Cooper admitted that he was discharging from the lagoon into the creek without a permit and that DEQ had notified him that these discharges were in violation of the VPDES program. Cooper acknowledged that he might go to jail. He told Goers that he had hired an attorney to fight on his behalf and stated, "I'm going to fight as long as God gives me the power to fight."

On October 21, 2004, Cooper was indicted on thirteen felony counts of knowingly discharging a pollutant into waters of the United States without a permit, in violation of 33 U.S.C. §§ 1311(a) and 1319(c)(2)(A). After his indictment, Cooper finally ceased discharging from the lagoon. He hired a septic hauling company to collect sewage and ultimately disconnected most of the trailers from the lagoon.

Before trial, the government sought a ruling on the admissibility of evidence of Cooper's dealings with DEQ from 1998 until the start of the charging period in 2003. The district court allowed the evidence, finding that it was relevant to the charged offenses and that it was admissible under Federal Rule of Evidence 404(b) as evidence of intent and the absence of mistake or accident.

During jury deliberations, the jury sent a question to the judge, asking for clarification on how to weigh certain evidence relating to labo-

ratory analysis of the discharge samples. The court declined to give direction, explaining that doing so would constitute an inappropriate encroachment upon the jury's role as fact-finder.

After a three-day jury trial, on April 28, 2005 the jury found Cooper guilty on nine counts.\* The district court sentenced Cooper to 27 months' imprisonment, plus a $30,000 fine for each count of conviction, resulting in a total fine of $270,000. Defendant appeals.

## II.

We briefly address at the outset Cooper's challenge to the district court's evidentiary rulings. Cooper argues that the district court erred in admitting evidence under Federal Rule 404(b) of Cooper's interactions with DEQ from 1998 to 2003. Reviewing the district court's ruling for abuse of discretion, *see United States v. Hedgepeth*, 418 F.3d 411, 418-19 (4th Cir. 2005), we find that the court did not err in admitting this evidence.

Rule 404(b) prohibits the introduction of evidence of prior acts for the purpose of proving the character of a person. Fed. R. Evid. 404(b). Rule 404(b) only applies, however, to evidence relating to acts extrinsic to the conduct being prosecuted. *See United States v. Lipford*, 203 F.3d 259, 268 (4th Cir. 2000). Evidence intrinsic to the story of the crime does not fall under Rule 404(b)'s prohibition. *See id.* (evidence "served to complete the story" with respect to conspiracy charge). Even where evidence predates the time period of the indictment, the government is allowed to provide context relevant to the criminal charges. *United States v. Kennedy*, 32 F.3d 876, 885 (4th Cir. 1994).

---

\*One count was dismissed by the district court on the government's motion. On the three other counts, the jury returned a verdict of not guilty. The evidence supporting these counts differed from that supporting the counts on which Cooper was convicted. The discharge sample for Count 4 was analyzed for E. Coli Bacteria using a methodology approved by DEQ for drinking water but not wastewater analysis. The laboratory records for the Count 12 sample indicated that materials that were past their expiration date had been used in the sample's analysis. The Count 13 sample did not undergo bacterial analysis because of a closure of the laboratory due to flooding.

In this case, the extended history of Cooper's dealings with DEQ is inextricably intertwined with the CWA violations alleged at trial. The DEQ evidence describes longstanding conditions at the lagoon and Cooper's awareness of those conditions, a fact relevant to his mens rea under the CWA. At the very least, the evidence explains how Cooper came to be without permission to discharge into the creek, a necessary predicate to his being charged with discharging pollutant without a permit. *See id.* (testimony about city drug investigation relevant to prosecution arising from later federal investigation).

Even if this evidence were within the ambit of 404(b), it would, as the district court noted, still be admissible. Rule 404(b) explicitly allows evidence that furnishes proof of the defendant's knowledge and the "absence of mistake or accident." *See* Fed. R. Evid. 404(b). The DEQ evidence is both relevant to and necessary for establishing Cooper's mens rea. *See United States v. Uzenski*, 434 F.3d 690, 710 (4th Cir. 2006). In this case, the government had to prove that the defendant knowingly discharged a substance that is regulated as a pollutant from the lagoon pipe into the creek. *See* 33 U.S.C. §§ 1311(a), 1319(c)(2)(A); *United States v. Wilson*, 133 F.3d 251, 264 (4th Cir. 1997); *United States v. Sinskey*, 119 F.3d 712, 715 (8th Cir. 1997); *United States v. Ahmad*, 101 F.3d 386, 391 (5th Cir. 1996); *United States v. Hopkins*, 53 F.3d 533, 541 (2d Cir. 1995); *United States v. Weitzenhoff*, 35 F.3d 1275, 1283-84 (9th Cir. 1994). The DEQ evidence demonstrates that Cooper did not act mistakenly or accidently but knew that he was discharging sewage and was doing so into the creek. The very existence of the DEQ permit established that Cooper was aware that the lagoon discharge contained raw sewage and that it flowed into the creek. From 1998 to 2003, multiple DEQ violation notices informed Cooper that pollutant levels in the discharge were excessive. DEQ notified Cooper repeatedly that he was in violation of his permit and, later, that he did not have a permit. Given the government's burden of proof, the DEQ evidence was relevant, reliable, and necessary to its task. *See United States v. Queen*, 132 F.3d 991, 995 (4th Cir. 1997).

Nor did the potential for unfair prejudice or confusion outweigh the probative value of the DEQ evidence. *See id.* Rule 403 exclusion should be invoked rarely, because "[t]he general policy of the Federal Rules . . . is that all relevant material should be laid before the jury."

*Mullen v. Princess Anne Volunteer Fire Co., Inc.*, 853 F.2d 1130, 1135 (4th Cir. 1998). The DEQ evidence, while it may provoke disgust, is undoubtedly probative in a CWA prosecution for the discharge of insufficiently treated human sewage. Evidence of criminal acts is of course by nature prejudicial, but the standard for exclusion under Rule 403 is "unfair" prejudice. *See United States v. Williams*, 445 F.3d 724, 730 (4th Cir. 2006). It was not unfair for the government to present this evidence. If unsavory evidence were excludable on that account, the prosecution could hardly prove its case.

Cooper also argues that the district court erred in its answer to a query put to it by the jury during deliberations. The jury asked whether it was "reasonable to consider numerous quality control issues of lab data/forms sufficient to render all results of the lab questionable." The court declined to give further instruction on the ground that it would constitute an inappropriate invasion of the jury's province as fact-finder. Here, too, the district court did not abuse its discretion. *See United States v. Smith*, 62 F.3d 641, 646 (4th Cir. 1995) (responses to jury questions on points of law "left to the sound discretion of the district court"). In fact, the trial court must take care, in responding to a jury question, not to encroach upon its fact-finding power. *See United States v. Ellis*, 121 F.3d 908, 925 (4th Cir. 1997). It can hardly be error for the district court to have accorded the jury this respect.

### III.

Cooper also contends that the district court erred in denying his motion for a judgment of acquittal for lack of sufficient evidence under Federal Rule of Criminal Procedure 29. Cooper argues that the government failed to prove that Cooper knew the waters into which he discharged pollutants "were a tributary of a navigable water, or adjacent to a navigable water, or had a significant nexus to a navigable water." The premise of this claim is that, under 33 U.S.C. §§ 1311(a) and 1319(c)(2)(A), the government had to prove that Cooper was aware of the facts that establish the federal government's jurisdiction over the water for purposes of the CWA. For the reasons explained below, we reject this contention.

A.

Cooper was convicted of knowingly discharging a pollutant without a permit from a point source to navigable waters, which are defined as waters of the United States. *See* 33 U.S.C. §§ 1311(a), 1319(c)(2)(A), 1362(7). "Waters of the United States" in this statutory scheme operates as a jurisdictional element. A jurisdictional element of a federal offense states the basis of Congress' power to regulate the conduct at issue: its "primary purpose is to identify the factor that makes the [conduct] an appropriate subject for federal concern." *United States v. Yermian*, 468 U.S. 63, 68 (1984). Without a jurisdictional basis for its exercise of its authority, Congress would be acting beyond its enumerated powers under Article I, Section 8 of the Constitution. "Waters of the United States" in the CWA is a classic jurisdictional element, which situates Congress' authority to enact the statute in "its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made." *Solid Waste Agency of N. Cook County v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172 (2001).

It is well settled that mens rea requirements typically do not extend to the jurisdictional elements of a crime — that "the existence of the fact that confers federal jurisdiction need not be one in the mind of the actor at the time he perpetrates the act made criminal by the federal statute." *United States v. Feola*, 420 U.S. 671, 677 n.9 (1975); *Yermian*, 468 U.S. at 68-69. This court has long recognized this principle in construing jurisdictional elements of federal criminal statutes. *See, e.g.*, *United States v. Langley*, 62 F.3d 602, 605-06 (4th Cir. 1995) (conviction under felon-in-possession statute does not require knowledge of firearm's interstate nexus); *United States v. Darby*, 37 F.3d 1059, 1067 (4th Cir. 1994) (conviction for transmitting threatening interstate communications does not require proof of knowledge that threatening telephone call was interstate); *United States v. Squires*, 581 F.2d 408, 410 (4th Cir. 1978) (conviction under National Stolen Property Act does not require proof of knowledge of interstate nature of transportation of counterfeit securities); *United States v. Green*, 544 F.2d 746, 747-48 (4th Cir. 1976) (per curiam) (conviction under firearms statute does not require knowledge that dealer was federally licensed); *United States v. LeFaivre*, 507 F.2d 1288, 1297-98 (4th Cir. 1974) (conviction under Travel Act does not require proof

of knowledge that cashing of checks involved use of interstate facilities).

Congress legislates against this well-established backdrop, aware that jurisdictional elements generally assert federal jurisdiction but do not create additional statutory elements as to which defendants must have formed the appropriate mens rea in order to have broken the law. *See Feola*, 420 U.S. at 676 & n.9; *Squires*, 581 F.2d at 410 (interstate transportation element "merely jurisdictional"); *Green*, 544 F.2d at 747 (federal licensure element "jurisdictional only"); *LeFaivre*, 507 F.2d at 1297 n.14 (interstate facilities requirement "nothing more than the jurisdictional peg on which Congress based federal jurisdiction").

In *United States v. Feola*, the Supreme Court recognized that it is possible, in exceptional circumstances, that Congress might intend for a jurisdictional element to have both a jurisdictional and substantive component, rather than being "jurisdictional only." 420 U.S. at 677 n.9; *see id.* at 696. The Court also suggested that the primary authority in answering this question is the intent of Congress as expressed in the statute itself. *See id.* at 678-79; *Green*, 544 F.2d at 747. We thus turn to consider whether Congress has expressed an intention that "waters of the United States" in this case serve more than a jurisdictional function.

### B.

Of the four other circuits to have considered the scope of "knowingly" in § 1319(c)(2)(A), three have not extended it to "waters of the United States." *See Sinskey*, 119 F.3d at 715 ("knowingly" in § 1319(c)(2)(A) only "applies to the underlying conduct prohibited by the statute"); *Hopkins*, 53 F.3d at 541 ("knowingly" in § 1319(c)(2)(A) means that defendant "knew the nature of his acts and performed them intentionally"); *Weitzenhoff*, 35 F.3d at 1284 ("knowingly" in § 1319(c)(2)(A) refers to "knowingly engag[ing] in conduct that results in a permit violation"). The Fifth Circuit has held that "knowingly" applies to each element of the offense "[w]ith the exception of purely jurisdictional elements," without stating explicitly whether "waters of the United States" constitutes such a purely jurisdictional element. *Ahmad*, 101 F.3d at 391.

The CWA offers every reason to conclude that the term "waters of the United States" as it operates in this case is "nothing more than the jurisdictional peg on which Congress based federal jurisdiction." *LeFaivre*, 507 F.2d at 1297 n.14. We begin as always with an examination of the statute itself. *See N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995). 33 U.S.C. § 1319(c)(2)(A) makes it a felony for any person to "knowingly violate[ ] section 1311 . . . ." Section 1311(a) provides that "the discharge of any pollutant by any person shall be unlawful." *Id.* § 1311(a). Section 1362(12) defines the "discharge of a pollutant" as the "addition of any pollutant to navigable waters," and section 1362(7) defines "navigable waters" as "waters of the United States." *Id.* §§ 1362(7), 1362(12). "Waters of the United States" is further defined by regulation. *See* 40 C.F.R § 122.2.

The question, then, is whether Congress intended for the term "knowingly" in § 1319(c)(2)(A) to extend, via § 1311(a), to "navigable waters" in § 1362(12), and thus to "waters of the United States" in § 1362(7), with the result that the government must prove that Cooper was aware of the facts connecting the small creek to the regulatory definition of "waters of the United States." To say the least, the statute's string of provisions hardly compels such a reading. If Congress meant to overcome the customary understanding that mens rea requirements do not attach to jurisdictional elements, it would have spoken much more clearly to that effect.

The stated purposes of the Act provide further support for this view. As articulated by Congress, the principal goal of the Act is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). This purpose would be severely undermined if polluters could only be prosecuted for knowingly polluting the nation's waters when the government could prove they were aware of the facts conferring federal jurisdiction. Such a blanket rule would be absurd in many cases, including the present one. Cooper's deliberate discharge of human sewage into running waters is exhaustively recorded. He knew he was discharging sewage into them, he knew his treatment facilities were inadequate, and he knew he was acting without a permit. It seems unlikely that Congress intended for culpability in such an instance to turn upon whether the defendant was aware of the jurisdictional nexus of these acts, any

more than, for example, Congress intended conviction of a felon-in-possession offense to turn upon the defendant's knowledge of the interstate travels of a firearm. *See Langley*, 62 F.3d at 606.

This conclusion squares with the Supreme Court's analysis of congressional intent as to jurisdictional elements in *Feola*. In that case, the Court considered 18 U.S.C. § 111, proscribing assault of a federal officer. 420 U.S. at 672-73. The Court recognized the "federal officer" requirement as a jurisdiction-conferring element and went on to consider whether it also functioned as a substantive element of the offense — that is, whether Congress intended for the statute to punish only those defendants who were aware that their victims were federal officers. *See id.* at 676 & n.9. The Court concluded that Congress intended for the statute both to deter conduct intended to obstruct federal law enforcement activities and to protect federal law enforcement officers to the fullest extent possible. *See id.* at 678-79. Given the statute's clear aims, the Court said, it "cannot be construed as embodying an unexpressed requirement that an assailant be aware that his victim is a federal officer. All the statute requires is an intent to assault, not an intent to assault a federal officer." *Id.* at 684.

Just as Congress in 18 U.S.C. § 111 intended to "accord[ ] maximum protection to federal officers," *id.*, so Congress in the CWA clearly intended to provide strong protection to the nation's waterways. To attach a mens rea to the jurisdictional element would as surely undermine Congress' intent here as it would have in *Feola*. We cannot broadly exempt environmental crimes from the longstanding rule that mens rea requirements do not pertain to jurisdictional facts. Such a blanket exception would not only be astonishingly broad, but it would also suggest without objective basis that separate and less stringent rules apply to environmental harms. Finding in the CWA a broad exception to the general rule would be tantamount to assuming that Congress, in creating criminal penalties for environmental degradation, did not really mean what it said.

The fact that Congress in the CWA expressed the additional goal of "protect[ing] the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution" does not change the conclusion that Congress did not intend for the government to prove the defendant's jurisdictional knowledge. 33 U.S.C. § 1251(b). Congress'

desire not to encroach upon the states is already captured by the government's uncontroverted burden of proving the existence of the jurisdictional facts. It would hardly further advance Congress' concern for *states* to impose the additional burden of proving an *individual*'s knowledge of those jurisdictional facts. In cases like this one, such a requirement would in fact impede state interests. In the CWA, Congress expressed its respect for states' role through a scheme of cooperative federalism that enables states to "implement . . . permit programs" like the Virginia VPDES program. *Id.* In this case, Virginia DEQ officers worked with the EPA to achieve a shared goal: an end to years of deleterious pollution. It would be odd if Congress chose to further this shared goal by making it substantially more difficult to prosecute environmental crimes in even the most flagrant of cases.

Our conclusion today is further supported by the fact that it hardly encourages exceptionable or unfair prosecution. The Supreme Court in *Feola* justified its interpretation of § 111 by noting that it posed "no snare for the unsuspecting:"

> The situation is not one where legitimate conduct becomes unlawful solely because of the identity of the individual or agency affected. . . . The concept of criminal intent does not extend so far as to require that the actor understand not only the nature of his act but also its consequence for the choice of a judicial forum.

420 U.S. at 685. "Criminal intent serves to separate those who understand the wrongful nature of their act from those who do not, but does not require knowledge of the precise consequences that may flow from that act once aware that the act is wrongful." *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 73 n.3 (1994).

This case differs from *United States v. Wilson*, where the defendants were prosecuted under the CWA for knowingly discharging fill material into a wetland without a permit. 133 F.3d at 253. In *Wilson*, the defendants contended that they did not know that the parcels of land into which they discharged material were, in fact, wetlands falling within the purview of the CWA; further, the defendants contended that the Army Corps of Engineers, the body charged with issuing per-

mits governing discharge of fill material into CWA-regulated wetlands, had doubts on the same issue. *Id.* at 255. Moreover, Maryland law did "not appear" to outlaw the activity in question. *Id.* at 264 n.*. Only in that limited context, did this court hold that the case was not "governed by *Feola*" and so the government bore the burden of proving, among other things, "that the defendant was aware of the facts establishing the required link between the wetland [into which he discharged the fill material] and waters of the United States." *Id.* at 264 & n.*.

In this case, there is no record of any confusion on the part of the relevant federal agency as to whether the CWA applies. Moreover, Cooper's conduct — discharging improperly treated human sewage into a creek — is most certainly a crime under Virginia law. Virginia's State Water Control Law prohibits unpermitted discharge of sewage into "state waters," which are defined as "all water on the surface and under the ground" that is wholly or partially within the Commonwealth. *See* Va. Code Ann. §§ 62.1-44.3, -44.5. Knowing violation of this prohibition constitutes a felony punishable by one to three years' imprisonment or a sentence of not more than twelve months and a fine of $5,000 to $50,000 for each violation. *See id.* § 62.1-44.32. Thus, on the rationale of *Wilson*, this case is "governed by *Feola*." 133 F.3d at 264 n.*.

In sum, the creek's status as a "water of the United States" is simply a jurisdictional fact, the objective truth of which the government must establish but the defendant's knowledge of which it need not prove. The language of the relevant statutes — 33 U.S.C. §§ 1311(a), 1319(c)(2)(A), 1362(7) — the congressional intent that text plainly reflects, as well as relevant precedent, all require this conclusion.

### IV.

The government did, however, have to prove that Cooper knowingly discharged the sewage into the creek. *See* 33 U.S.C. § 1319(c)(2)(A); *Wilson*, 133 F.3d at 264; *Sinskey*, 119 F.3d at 715; *Ahmad*, 101 F.3d at 391; *Hopkins*, 53 F.3d at 541; *Weitzenhoff*, 35 F.3d at 1283-84. Cooper makes two contentions: that the government failed to establish that Cooper's lagoon discharge reached the creek and that it failed to prove that Cooper knew that it did so. We review

this evidence in the light most favorable to the government. *See United States v. Burgos*, 94 F.3d 849, 860 (4th Cir. 1996) (en banc).

First, Cooper claims the government failed to prove that Cooper's lagoon discharged into the creek because DEQ Inspector Troy Nipper did not testify that he had seen the discharge enter the creek in the course of his DEQ inspections. This contention is without merit. On direct examination, Mr. Nipper briefly described the inspection reports he completed during the charging period on the discharge pouring from the lagoon's discharge pipe. While Mr. Nipper never stated on the stand that the discharge from the pipe entered the creek, his entire testimony was premised on that fact, as evidenced by his discussion at the outset of a map that he helped to prepare depicting the trailer park and the course of Sandy Creek. Moreover, Mr. Nipper's inspection reports, entered into evidence as Government's Exhibit 60, directly connected the discharge to the creek, noting the discharge's adverse impact on the "receiving stream." Additionally, DEQ Inspector Casey MacGruder testified that the discharge pipe and the creek were connected by a short channel. Ms. MacGruder testified that the channel was "[m]aybe ten feet, if that. It's not far before it hits the actual stream."

Second, the government provided sufficient evidence not only that the pollutants discharged by Cooper flowed into the creek, but that he was well aware of this fact. The DEQ evidence admitted to establish Cooper's state of mind, *see* Fed. R. Evid. 404(b), provides ample proof of his knowledge that he was discharging into the creek. Cooper's 1997-2002 DEQ permit stated on its face that it allowed Cooper to discharge into a "receiving stream" that was part of the Roanoke River basin. Indeed, the whole of Cooper's long saga of interactions with DEQ revolved around the fact that he was discharging pollutants into the creek. Cooper testified at the 2003 DEQ hearing that he was at the lagoon "almost every day." It would have been difficult, to say the least, for him to miss the DEQ inspectors who regularly surveyed the creek and took note of the algae, bloodworms, dark solids, and other in-stream conditions. Indeed, the inspection reports reflect that Cooper was present at some of the inspections. It also would have been difficult for Cooper to miss the inspection reports mailed to him after each inspection, which routinely recorded conditions in the "receiving stream." The 1998 Consent Order, negotiated and signed by

Cooper, states that the lagoon "discharges to an unnamed tributary of Sandy Creek." In 2001, Cooper submitted a permit renewal application that stated that he discharged into "Sandy Run Branch." The permit, the inspections, the reports, the violation notices, the warnings, the fines, the negotiations and renegotiations — all these were founded squarely on the fact that Cooper was discharging pollutants impermissibly into the creek and knew it very well.

If that were not enough, EPA Special Agent Matthew Goers testified that on October 29, 2003 — during the EPA criminal investigation — Cooper admitted that his lagoon was discharging into the creek. When asked on direct examination if Cooper "sa[id] anything . . . regarding his knowledge of whether the lagoon was or was not discharging into Sandy Creek or an unnamed tributary of Sandy Creek," Mr. Goers responded, "He did. He told us on the evening of the interview that his lagoon was continuing to discharge." Mr. Goers continued, "Essentially what he was describing is 3,000 gallons a day were being discharged to the lagoon. And as the lagoon filled to a certain point, it would automatically spill over through gravity towards the outfall and into the creek." The evidence could hardly be more compelling. It supported the jury's verdict on all counts of which Cooper was convicted.

The judgment of the district court is hereby

*AFFIRMED.*