**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-4733

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

MICHAEL WELLINGTON LOGAN,

        Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Liam O'Grady, District Judge. (1:12-cr-00506-LO-2)

Argued: October 28, 2014        Decided: November 26, 2014

Before WILKINSON and KING, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Affirmed by unpublished per curiam opinion.

**ARGUED**: Kevin R. Brehm, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant. Alexander T.H. Nguyen, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF**: Michael S. Nachmanoff, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant. Dana J. Boente, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Michael Wellington Logan (Logan) was convicted of numerous offenses arising from his involvement in a scheme to defraud the Navy Federal Credit Union (NFCU), a federally-insured financial institution headquartered in Vienna, Virginia. On appeal, Logan presses three arguments: (1) the district court erred when it admitted certain testimonial evidence; (2) the district court erred when it gave a willful blindness instruction; and (3) there is insufficient evidence in the record to support his convictions. For the reasons stated below, we affirm.

I

A

In 2007, Logan and Theodric Bingham (Bingham) created Cash Money Brothers (CMB), a property management firm in Snellville, Georgia. Between November 1, 2007 and September 12, 2008, Logan and Bingham used CMB to defraud NFCU out of $467,283.19.

The scheme to defraud worked as follows. Either Logan or Bingham would approach a potential client about investing in real estate. Often, these people had little or no real estate investment experience. Logan or Bingham touted CMB's property management services, which they said included finding a property for the client to purchase with no money down, helping the client obtain financing through NFCU, finding a suitable tenant

2

for the property, collecting rent payments, paying the mortgage payments and property taxes when due, and making necessary repairs to the property. As the sales pitch went, it was a win-win for the client because they put no money down on the property and all of the expenses for the property were to be covered by the collected rent payments.

Once the potential client was sold on CMB's property management services, Logan went to work on finding a property to purchase. In all, Logan and Bingham successfully duped five individuals, and the scheme involved a total of nine properties. After a suitable property was found, the client applied for membership with NFCU and, once membership was accepted, the client applied for a home equity loan on the property. Having the client apply for a home equity loan instead of a first mortgage was an integral part of the scheme. At NFCU, home equity loans were easier to obtain because they involved "less restrictive underwriting guidelines" than first mortgages. (J.A. 474).[1] They also permitted the borrower to borrow sums more than the property was worth. In this case, the amount of each home equity loan was more than the recent purchase price of

---

[1] As a former employee in NFCU's mortgage equity department, Bingham was familiar with how loans, in particular home equity loans, were processed at NFCU.

the respective property, and in one case the home equity loan amount exceeded two times the recent purchase price.

In filling out the membership and home equity loan applications, the borrower included false information supplied by either Logan or Bingham. The false information on these applications was necessary, first to gain NFCU membership and, second, to increase the chances that NFCU would approve the home equity loan application. Because the borrower was applying for a home equity loan, Logan and Bingham made arrangements to have the property put in the borrower's name, without the borrower's knowledge or consent, before the home equity loan's closing date. Thus, the borrower had no knowledge that he actually owned the home before he went to the closing.

The fraudulent home equity loan application was reviewed by one of the two employees of NFCU that were bribed by Logan and Bingham to approve the application. According to one of these employees, Duane Nixon, he was paid $700 for each fraudulent home equity loan that he helped close.

Once the fraudulent home equity loan application was approved, Logan and/or Bingham accompanied the borrower to the closing. Once the home equity loan proceeds were dispersed, the borrower was instructed to give CMB access to such proceeds. In some cases, a joint-checking account in Georgia was opened to allow the home equity loan proceeds to be wired directly from

4

NFCU to the joint-checking account. Logan assured these borrowers that the joint-checking account would be used to manage the property and repay the home equity loan. In other cases, the home equity loan proceeds were wired from NFCU to a borrower's bank account in Georgia and then either given directly to Logan or transferred to CMB's account. For all but one of the home equity loans, the borrower received a small portion of the loan proceeds, usually about $4,000.00. For one transaction, Logan said the money was paid for "having the process go smooth." (J.A. 406). Unfortunately for each borrower, once Logan and Bingham gained access to the home equity loan proceeds, they almost immediately spent the money for their respective personal uses. As the scheme unfolded, CMB did collect rent and make repairs on certain properties, but eventually all of the home equity loans fell into default and the properties were sold in foreclosure, resulting in a $467,283.19 loss to NFCU.

B

On March 27, 2013, by way of a superseding indictment, a federal grand jury sitting in the Eastern District of Virginia charged Logan with: (1) one count of conspiring with Bingham and Nixon to commit bank and wire fraud, 18 U.S.C. §§ 1343, 1344, and 1349; (2) six counts of wire fraud, and aiding and abetting the same, id. §§ 2 and 1343; and (3) four counts of money

5

laundering, and aiding and abetting the same, id. §§ 2 and 1957.[2] Following a jury trial, the jury convicted Logan of all counts. On September 20, 2013, Logan received concurrent sentences of 42 months' imprisonment on each count of conviction. He noted a timely appeal.

II

Logan contends that the district court committed reversible error when it admitted, over his objection, certain testimonial evidence from the five borrowers who were duped in the scheme to defraud NFCU. As part of proving the scheme to defraud NFCU, the government introduced testimonial evidence from each of the five borrowers showing that Logan and/or Bingham assisted each borrower with submitting false membership and home equity loan applications to NFCU. The borrowers also testified that they submitted such false applications because CMB was going to completely manage the purchased property. The government also introduced testimonial evidence showing that each borrower was

_____

[2] The facts set forth in this opinion formed the basis of the conspiracy count. Four wire transfers from NFCU to two borrower/Logan joint-checking accounts in Georgia formed the basis of four of the six wire fraud counts. Two wire transfers from NFCU to a borrower's individual checking account in Georgia formed the basis of the two remaining wire fraud counts. Four transfers from a borrower's checking account to the CMB account formed the basis of the four money laundering counts.

instructed by either Logan or Bingham to give CMB access to the home equity loan proceeds. Finally, the government introduced testimonial evidence from the borrowers showing that Logan made false statements concerning property management issues that arose after the closing, made unauthorized expenditures from the joint-checking accounts to which he had access, failed to make home equity loan payments as promised, and, at times, refused to provide information about the status of properties when requested to do so.

Logan argues that, because the superseding indictment only charged him with defrauding NFCU (and not the borrowers as well), the borrowers could only testify concerning "their personal knowledge about the NFCU loan and membership applications in question and their personal knowledge regarding the bank accounts identified in the indictment." Appellant's Br. at 20. As this argument goes, "the trial testimony of the borrowers . . . went beyond that limited scope" and was "clearly irrelevant" because such testimony "would have occurred after the transmission of the loan funds by NFCU when the fraud against NFCU was over." Appellant's Br. at 20-21. Thus, Logan posits, the challenged testimonial evidence--false statements and actions after the transfer of the home equity loan proceeds--was inadmissible under Rules 403 and 404(b) of the Federal Rules of Evidence.

7

We review evidentiary rulings of the district court for an abuse of discretion. United States v. Delfino, 510 F.3d 468, 470 (4th Cir. 2007). An error of law is, by definition, an abuse of discretion. United States v. Singh, 518 F.3d 236, 251 (4th Cir. 2008). We will not "vacate a conviction unless we find that the district court judge acted arbitrarily or irrationally in admitting evidence." United States v. Benkahla, 530 F.3d 300, 309 (4th Cir. 2008) (citation and internal quotation marks omitted).

Under Rule 404(b)(1), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Such evidence, however, may "be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Moreover, "[t]o be admissible under Rule 404(b), evidence must be (1) relevant to an issue other than character; (2) necessary; and (3) reliable." United States v. Siegel, 536 F.3d 306, 317 (4th Cir. 2008) (citation and internal quotation marks omitted). Rule 404(b) is "an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove only criminal disposition." United States v. Young, 248 F.3d 260, 271–72 (4th

8

Cir. 2001) (citation and internal quotation marks omitted). And, "[a]s a rule of inclusion, the rule's list is not exhaustive." United States v. Queen, 132 F.3d 991, 994–95 (4th Cir. 1997).

The Rule 404(b) inquiry, however, applies only to evidence of other acts that are "extrinsic to the one charged." United States v. Chin, 83 F.3d 83, 87 (4th Cir. 1996). "[A]cts intrinsic to the alleged crime do not fall under Rule 404(b)'s limitations on admissible evidence." Id. at 87–88. "Evidence of uncharged conduct is not other crimes evidence subject to Rule 404 if the uncharged conduct arose out of the same series of transactions as the charged offense, or if [evidence of the uncharged conduct] is necessary to complete the story of the crime on trial." Siegel, 536 F.3d at 316 (citation and internal quotation marks omitted); see also Chin, 83 F.3d at 88 (noting that "[o]ther criminal acts are intrinsic when they are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged") (citation and internal quotation marks omitted). Evidence is intrinsic if it is necessary to "provide context relevant to the criminal charges." United States v. Cooper, 482 F.3d 658, 663 (4th Cir. 2007).

In this case, the challenged testimonial evidence--false statements and actions after the transfer of the home equity

loan proceeds--does not fall within the reach of Rule 404(b). Rather, the challenged testimonial evidence was relevant and direct evidence under Rule 401(a) proving the scheme to defraud NFCU. The scheme to defraud NFCU involved two parts. The first part of the scheme to defraud NFCU involved duping each borrower into getting a home equity loan with NFCU with the false promise of complete property management. By falsely promising each borrower that the property would be completely managed, Logan and/or Bingham lured each borrower into submitting false membership and home equity loan applications to NFCU and induced them into giving CMB access to the home equity loan proceeds. The second part of the scheme involved duping NFCU into believing the membership and home equity loan applications were legitimate. This was achieved with the false information supplied to the borrowers by Logan and/or Bingham and the assistance of the two NFCU insiders. The challenged testimony was relevant and necessary to prove an integral component of the first part of the scheme--that the promises made by Logan and Bingham concerning complete property management were false. The only way to prove the first part of the scheme was by introducing the testimony of the borrowers demonstrating that Logan and Bingham did not live up to the promises they made concerning complete management.

In sum, the challenged testimony was admissible under Rule 401(a) to prove the scheme to defraud NFCU. Moreover, there is nothing unduly prejudicial about the challenged testimony that would bar its admission under Rule 403. We find no abuse of discretion.

## III

Logan challenges the district court's decision to give the jury a willful blindness instruction, arguing that the instruction was not supported by any evidence that he deliberately ignored information concerning the scheme to defraud NFCU. In holding that the willful blindness instruction was appropriate, the district court reasoned:

> [Counsel for Logan], your theory of the case is that Mr. Logan could have done what he did in this corporate entity [CMB] and not have appreciated the significance of the unlawfulness of his acts. And I think that as you argued in opening statement or indicated you are going to argue in closing, that makes the deliberate ignorance instruction 59 relevant because the jury will have to determine whether in fact Mr. Logan knowingly and intentionally participated in this scheme or whether he was an unwitting person. And so, I think the deliberate ignorance instruction is proper under those circumstances.

(J.A. 578). During its charge to the jury, the district court gave the following standard jury instruction on willful blindness:

11

The Government may prove the defendant acted knowingly by proving beyond a reasonable doubt that this defendant deliberately closed his eyes to what would otherwise have been obvious to him. No one can avoid responsibility for a crime by deliberately ignoring what is obvious. A finding beyond a reasonable doubt of an intent of defendant to avoid knowledge or enlightenment would permit the jury to find knowledge. Stated another way, a person's knowledge of a particular fact may be shown from a deliberate or intentional ignorance or deliberate or intentional blindness to the existence of a fact. It is, of course, entirely up to you as to whether you find any deliberate ignorance or deliberate closing of the eyes and any inferences to be drawn from such evidence. You may not conclude that the defendant had knowledge, however, from proof of mistake, negligence, carelessness, or a belief in an inaccurate proposition.

(J.A. 662-63).

We review a district court's decision to give a willful blindness instruction for an abuse of discretion. United States v. Jinwright, 683 F.3d 471, 478 (4th Cir. 2012). The government can prove the knowledge element of a crime by showing that the defendant either had actual knowledge or was willfully blind to facts he should have known. United States v. Abbas, 74 F.3d 506, 513 (4th Cir. 1996). "A willful blindness instruction is appropriate when the defendant asserts a lack of guilty knowledge but the evidence supports an inference of deliberate ignorance." Id. (citation and internal quotation marks omitted). When given, a "willful blindness instruction allows the jury to impute the element of knowledge to the defendant if the evidence indicates that he purposely closed his eyes to

12

avoid knowing what was taking place around him." United States v. Schnabel, 939 F.2d 197, 203 (4th Cir. 1991). For a district court to give a willful blindness instruction, "all that is necessary is evidence from which the jury could infer deliberate avoidance of knowledge." United States v. Whittington, 26 F.3d 456, 463 (4th Cir. 1994).

In this case, beginning with the opening statement and ending with closing argument, Logan asserted a lack of knowledge concerning the scheme to defraud NFCU. He unsuccessfully portrayed himself as a dedicated property manager completely without knowledge of the fraud Bingham and others were perpetrating on NFCU. Because there was sufficient evidence from which the jury could find that Logan consciously closed his eyes to the fact that he was involved in a scheme to defraud NFCU, the district court acted well within its discretion when it gave the willful blindness instruction. See Abbas, 74 F.3d at 513-14 (holding that a willful blindness instruction was appropriate where the evidence before the jury supported the inference that the defendant consciously closed his eyes to the fact that he was involved in an obvious drug transaction).

IV

Finally, Logan claims that there is insufficient evidence in the record to support his convictions. The gist of Logan's

13

argument is that there is insufficient evidence in the record demonstrating that he acted with the specific intent to defraud, a requisite element of his offenses. See United States v. Adepoju, 756 F.3d 250, 255 (4th Cir. 2014) (noting that bank fraud under § 1344(1) requires three elements: "(1) the defendant knowingly executed or attempted a scheme or artifice to defraud a financial institution, (2) he did so with intent to defraud, and (3) the institution was a federally insured or chartered bank"); id. (noting that bank fraud under § 1344(2) requires three elements: (1) "the defendant knowingly execute a scheme to obtain property held by a financial institution through false or fraudulent pretenses"; "(2) he did so with intent to defraud[;] and (3) the institution was a federally insured or chartered bank"); United States v. Simpson, 741 F.3d 539, 547 (5th Cir. 2014) ("The elements of conspiracy under 18 U.S.C. § 1349 [(conspiracy to commit mail, wire, bank, securities or commodities, or health care fraud)] are: (1) two or more persons made an agreement to commit an unlawful act; (2) the defendant knew the unlawful purpose of the agreement; and (3) the defendant joined in the agreement willfully, with the intent to further the unlawful purpose."); United States v. Wynn, 684 F.3d 473, 477 (4th Cir. 2012) ("Thus, to convict a person of . . . wire fraud, the government must show that the defendant (1) devised or intended to devise a scheme to defraud

14

and (2) used the . . . wire communications in furtherance of the scheme."); id. at 474 (noting that, "[t]o establish a scheme to defraud, the government must prove that the defendant[] acted with the specific intent to defraud") (citation and internal quotation marks omitted); United States v. Campbell, 977 F.2d 854, 857 (4th Cir. 1992) (noting that, to obtain a money laundering conviction under § 1957, the government is required to prove that the defendant knowingly engaged in a monetary transaction in property of a value of over $10,000 that was derived from a specific unlawful activity).

We review challenges to the sufficiency of evidence de novo. United States v. Roe, 606 F.3d 180, 186 (4th Cir. 2010). "The jury's verdict must be upheld on appeal if there is substantial evidence in the record to support it, where substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." United States v. Perry, 757 F.3d 166, 175 (4th Cir. 2014) (citation and internal quotation marks omitted). In considering whether there is substantial evidence to support a conviction, we must "view[] the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the Government." Id. (citation and internal quotation marks omitted).

In this case, the record contains overwhelming evidence demonstrating that Logan acted with the specific intent to defraud. He and Bingham concocted a scheme to defraud NFCU by duping each borrower into believing that CMB would completely manage the purchased property. Logan helped various borrowers with submitting false membership and home equity loan applications to NFCU. Logan bribed two employees of NFCU to approve the home equity loans, and he took the bulk of the loan proceeds, after the proceeds were wired and/or laundered, and spent such proceeds for his personal use. In view of this evidence, the jury understandably found that Logan acted with the requisite specific intent.

V

For the reasons stated herein, the judgment of the district court is affirmed.

AFFIRMED

16